THRIFTY OIL CO., Appellant,

v.

BANK OF AMERICA NATIONAL
TRUST AND SAVINGS AS-
SOCIATION, Appellee.

No. 00–56159.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 2002.

Filed Nov. 19, 2002.

Amended March 6, 2003.

Stephan M. Ray and Robert A. Greenfield, Stutman, Treister & Glatt, Los Angeles, CA, for the appellant.

Matthew S. Walker, Pillsbury Madison & Sutro, San Diego, CA, for the appellee.

Before HALL, THOMPSON, and WARDLAW, Circuit Judges.

## ORDER AND AMENDED OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge.

The opinion filed November 19, 2002, is hereby amended to include the following:

Bank of America ("BofA") seeks an award of attorney's fees incurred in connection with this appeal.[1] Thrifty disputes BofA's eligibility for attorney's fees, arguing that BofA waived its right to fees in a settlement agreement entered into during proceedings in the bankruptcy court. Thrifty also argues that even if BofA did not waive its right to attorney's fees, fees should not be awarded because the primary issues on appeal were based on federal, rather than state, law.

Thrifty contends that BofA waived its right to seek attorney's fees when it entered into a settlement agreement that provided, *inter alia*, "[i]n full satisfaction of any and all post-Petition Date claims against the Debtors ... the Debtors shall have no liability for post-Petition Date [attorney's fee] expenditures." However, the Swap Claim is a *pre*-Petition claim and is not subject to this waiver. *See In re Healthco Int'l, Inc.*, 272 B.R. 510, 512 (1st Cir. B.A.P.2002) ("[C]laims founded on executed prepetition contracts are prepetition claims."). Accordingly, we reject Thrifty's waiver argument and consider the merits of BofA's request for fees.

Attorney's fees may be awarded to an unsecured creditor in a bankruptcy proceeding only to the extent that state law

---

1. BofA's claim for attorney's fees arises out of a contract between the parties, which requires the "defaulting party" to pay attorney's fees incurred "by reason of the enforcement or protection of its rights under this Agreement." Thrifty does not dispute the validity of this contractual provision, nor does Thrifty dispute that it is a defaulting party within the meaning of the contract.

governs the substantive issues and authorizes the court to award fees. *Renfrow v. Draper*, 232 F.3d 688, 694 (9th Cir.2000). In *Renfrow*, a creditor, the debtor's former wife, successfully sought a judgment that certain debts were nondischargeable. 232 F.3d at 694. In order to prove nondischargeability, the creditor was required to demonstrate the validity of the parties' divorce decree, which assigned the debts at issue to the debtor. *Id.* After judgment was entered in the creditor's favor, she sought attorney's fees pursuant to a "hold harmless" provision in the divorce decree. *Id.* at 691. We held that the creditor was entitled to the portion of attorney's fees incurred in connection with litigating state law issues; namely, the validity and amount of debts owed to her under the divorce decree. *Id.* at 694.

■ Under *Renfrow*, a creditor can recover attorney's fees incurred in connection with litigating the validity of a contract, even if the ultimate issue in the case is one of bankruptcy law. By contrast, the mere presence of an attorney's fees provision in the contract giving rise to the debt at issue does not entitle a prevailing party to attorney's fees. *See In re Hashemi*, 104 F.3d 1122, 1127 (9th Cir.1996) ("[T]he question of the applicability of the bankruptcy laws to particular contracts is not a question of the enforceability of a contract but rather involves a unique, separate area of federal law.") (citing *In re Coast Trading Co.*, 744 F.2d 686, 693 (9th Cir.1984)). Our past cases awarding attorney's fees to prevailing debtors conform to the same basic principles. *See In re Baroff*, 105 F.3d 439, 440–42 (9th Cir.1997) (awarding fees incurred by a prevailing party debtor in defending a state law fraudulent inducement claim, but refusing to award fees incurred in connection with a related issue of bankruptcy law).

■ *Renfrow*, *Hashemi*, and *Baroff* permit a prevailing party in a bankruptcy proceeding to receive attorney's fees incurred while litigating the enforceability of a contract. The California Bucket Shop law, if applicable, would have rendered the Swap Claim at issue unenforceable. We therefore conclude that BofA is entitled to attorney's fees incurred in connection with its successful defense of Thrifty's Bucket Shop objection on appeal.

Thrifty's § 502(b) objection, by contrast, was purely an issue of federal bankruptcy law. *See Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 163, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (holding that when, and under what circumstances, federal courts will allow interest on claims against debtor's estates has long been decided by federal law). Thus, the issue of attorney's fees in a § 502(b) case would ordinarily be a straightforward issue; because § 502(b) is exclusively governed by federal law, no fees could ordinarily be awarded to a prevailing party, absent a bankruptcy statute to the contrary.

The instant case, however, is somewhat atypical because, even though state law was irrelevant to the § 502(b) issue, the district court specifically requested that the parties brief issues of state contract law. The parties did so, and even though the district court ultimately decided the issue on purely federal grounds, the parties' appellate briefs repeatedly reference state contract law.

■ Despite the district court's error, we believe that a prevailing party should not be entitled to attorney's fees for litigation of state law issues merely tangential to an issue of federal bankruptcy law. This conclusion is consistent with our prior cases, in which we have awarded attorney's fees to prevailing bankruptcy parties only where the validity or enforceability of a contract was expressly at issue. Here, even though the parties were misled by the district court's order to brief issues of

state contract law, neither validity nor enforceability of the Swap Agreement was ever a true component of the § 502(b) issue.

For the foregoing reasons, we GRANT Bank of America's petition for attorney's fees with respect to fees incurred litigating the California Bucket Shop issue, and DENY the petition with respect to fees incurred litigating the § 502(b) issue. The case is referred to the Appellate Commissioner for a determination of the level of fees incurred by BofA in litigating the Bucket Shop issue on appeal. The Commissioner is authorized to enter a judgment for that amount against Thrifty.

### OPINION

The decision of the District Court granting summary judgment to appellee Bank of America is hereby AFFIRMED for the reasons stated in Judge Whelan's opinion, reported at *Thrifty Oil Co. v. Bank of America (In re Thrifty Oil Co.)*, 249 B.R. 537 (S.D.Cal.2000). The District Court's opinion is set forth below in *hæc verba*:

"Thrifty Oil Company ("Thrifty") appeals an order of the United States Bankruptcy Court, the Honorable Louise De-Carl Adler presiding, granting a motion for summary judgment brought by Bank of America National Trust & Savings Association ("BofA"). This Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 158(a)(1) & (c)(1)(A).

This appeal presents two questions: (1) whether "termination damages" under an interest rate swap agreement, entered into between a lender and a borrower as part of a larger financing transaction, constitute unmatured interest disallowed under Section 502(b)(2) of the Bankruptcy Code, and (2) whether interest rate swap agreements violate California's Bucket Shop Law. On summary judgment, the Bankruptcy Court answered both questions in the negative and entered judgment in favor of BofA. *See In re Thrifty Oil Co.*, 212 B.R. 147 (Bankr.S.D.Cal.1997).

The Court has read and considered Thrifty's opening, reply and supplemental briefs, BofA's responsive and supplemental briefs, all attached exhibits, the arguments of counsel and the applicable law. For the reasons expressed below, the Court AFFIRMS the judgment of the Bankruptcy Court.

### I. INTRODUCTION

To more thoroughly understand the facts of this case and the legal issues presented, the Court will provide a brief overview of derivative swap agreements.[1] A "swap" is a contract between two parties ("counterparties") to exchange ("swap") cash flows at specified intervals, calculated by reference to an index. Parties can swap payments based on a number of indices including interest rates, currency rates and security or commodity prices.

The "plain-vanilla" interest rate swap, the simplest and most common type of swap contract, obligates one counterparty to make payments equal to the interest which would accrue on an agreed hypothetical principal amount ("notional amount"), during a given period, at a specified fixed interest rate. The other counterparty must pay an amount equal to the interest which would accrue on the same notional amount, during the same period, but at a floating interest rate. If the fixed rate paid by the first counterparty exceeds the floating rate paid by the second counterparty, then the first counterparty must pay an amount equal to the difference between the two rates multiplied by the notional amount, for the specified interval.

---

1. The facts set forth in this section are derived from the undisputed portions of the parties' expert reports. (*See* BofA Ex. O at 29–41; Thrifty Ex. at 27–44).

Conversely, if the floating rate paid by the second counterparty exceeds the fixed rate paid by the first counterparty, the fixed-rate payor receives payment. The agreed hypothetical or "notional" amount provides the basis for calculating payment obligations, but does not change hands.

For example, suppose Counterparties A and B enter into a five-year interest rate swap with the following characteristics: (1) Counterparty A agrees to pay a floating interest rate equal to LIBOR, the London Interbank Offered Rate;[2] (2) Counterparty B agrees to pay a 10% fixed interest rate; (3) both counterparties base their payments on a $1 million notional amount and agree to make payments semiannually. If LIBOR is 9% upon commencement of the first payment period, Counterparty B must pay A: (10%–9%) * $1 million * (.5) = $5,000. These net payments vary as LIBOR fluctuates and continue every six months for the term of the swap. If interest rates rise, the position of Counterparty B, the fixed-rate payor, improves because the payments it receives increase. For example, if LIBOR rises to 11% at the beginning of the next payment period, Counterparty B receives a net payment of $5,000 from A. Conversely, the position of Counterparty A, the floating-rate payor, improves when interest rates fall. The party whose position retains positive value under the swap is considered "in the money" while a party with negative value is considered "out of the money." As discussed previously, the $1 million notional amount never changes hands.

Almost all interest rate swaps are documented with (1) a confirmation and (2) master agreement. Typically, master agreements are standard form agreements prepared by the International Swaps and Derivatives Association ("ISDA"). The master agreement governs all interest swap transactions between the counterparties. It includes provisions generally applicable to all swap transactions including: payment netting, events of default, cross-default provisions, early termination events and closeout netting.

Most master agreements provide that, in the event of an early termination or default, the party in the money is entitled to collect "termination damages." Termination damages represent the replacement cost of the terminated swap contract and are generally determined by obtaining market quotations for the cost of replacing the swap at the time of termination. Some master agreements, such as those at issue here, do not permit the defaulting party to collect termination damages.

Interest rate swap agreements provide a powerful tool for altering the character of assets and liabilities, fine tuning risk exposure, lowering the cost of financing or speculating on interest rate fluctuations. Borrowers can rely on interest rate swaps to reduce exposure to adverse changes in interest rates or to obtain financing characteristics unavailable through conventional lending. Interest rate swaps can modify a borrower's all-in funding costs from fixed-to-floating, floating-to-fixed or a combination of both.

Interest rate swaps have become an important part of international and domestic commerce, and the market for these instruments has experienced explosive growth. The ISDA has estimated that the collective notional amount on interest rate swaps reached $2.3 trillion in 1990, $12.8 trillion in 1995 and $22.3 trillion in 1997.[3]

---

2. "LIBOR" stands for London Interbank Offered Rate, the rate at which top-rated banks in the European money market provide funding to each other. LIBOR is the most widely used floating index for interest rate swaps.

3. *See* International Swaps and Derivatives Ass'n Market Survey (visited June 5, 2000) <http://www.isda.org/d1.html>.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### 1. Factual Overview

In August 1989, Golden West Refining Company ("GWR"), a Thrifty subsidiary, solicited proposals for a $75 million term loan from BofA and other potential lenders. GWR sought the loan to refinance a $52.1 million secured note that bore interest at an 11% fixed rate, and to finance capital improvements. GWR's financing goals included obtaining a commitment for up to $75 million in medium-term debt, with a fixed interest rate below 11% on the initial $50 million borrowing. On September 29, 1989, BofA submitted a written proposal to GWR. Working from the BofA proposal as a baseline, GWR and BofA negotiated a term sheet and exchanged several drafts between October 1989 and January 1990.

On January 12, 1990 GWR accepted a final term sheet for the loan. The term sheet provided a floating-rate term loan and required GWR to enter into one or more interest rate swaps to hedge the term loan's interest rate fluctuations. BofA permitted GWR to obtain the swaps up to six months after the term loan closed, from any suitable swap dealer. The term sheet further stated that BofA would syndicate the loan and act as agent. Syndication refers to a process whereby several lenders make a loan and one lender, the agent, maintains responsibility for loan administration. BofA agreed to fully fund the term loan pending syndication.

On July 30, 1990, BofA and GWR entered into a term loan agreement that incorporated these provisions. The agreement required GWR to draw down at least $43 million under the term loan and enter into at least $43 million in interest rate swaps. The agreement provided that the loan and swaps would be cross-collateralized and cross-defaulted. On the same day, Thrifty executed an unsecured guaranty in which it guaranteed GWR's obligations arising out of the term loan and swap agreements. The next day, BofA funded an initial $45 million borrowing.

Between June 20, 1990, and August 1, 1990, GWR executed three separate interest rate swaps with BofA aggregating $45 million. The effective dates for the three swap agreements ranged between August 1 and August 3, 1990, substantially coinciding with the closing of the term loan.[4] All three swaps followed an amortization schedule that closely followed the payment schedule of the term loan,[5] and all three swaps had termination dates of December 31, 1997—the maturity date for the term loan. Thus, within three days after the term loan closed, the parties had matched the loan with swaps in the same notional amount, for the same term, and following approximately the same amortization schedule.[6]

BofA sent GWR a confirmation for each interest rate swap that provided that BofA and GWR would sign a standard form agreement recommended by the ISDA.

---

**4.** The trade dates, notional amounts and fixed interest rates for the three swaps were: (1) June 20, 1990/$21.5 million/9.125% per annum; (2) July 12, 1990/$10.75 million/8.96% per annum, and (3) August 1, 1990/$12.75 million/8.66% per annum.

**5.** An "amortizing" interest rate swap is a swap whose notional amount declines at specified intervals during its term. Here, the amortization schedules for the three interest rate swaps declined at approximately the same rate as the principal balance owed under the term loan. However, prepayment of the balance owed under the term loan would not have affected the amortization schedule for the swaps.

**6.** GWR borrowed an additional $7 million under the term loan approximately 14 months after the term loan closed. GWR was not required to, nor did it, execute interest rate swaps to hedge the floating rate paid on this additional $7 million borrowing.

BofA and GWR signed a standard ISDA Master Agreement in January 1992. The agreement provided that the bankruptcy of either party would terminate the swaps and entitle the non-bankrupt party to recover termination damages, if any.

Through the combination of the term loan and the three swaps, GWR synthetically obtained $45 million in medium-term, fixed-rate financing. Under the term loan, GWR paid interest on $45 million computed at a floating rate plus 1%. Under the swaps, GWR (1) paid BofA a fixed rate on a notional amount of $45 million, and (2) received from BofA a floating interest rate on the same notional amount. The floating rate GWR paid on the $45 million term loan was effectively "canceled out" by the floating rate GWR received under the swaps. Thus, regardless of whether interest rates rose or fell, the combination of the swaps and term loan ensured that GWR paid a fixed rate of approximately 9.83%.[7]

## 2. PROCEDURAL HISTORY

On July 31, 1992, Thrifty and its subsidiaries, including GWR, commenced voluntary cases under Chapter 11 of the Bankruptcy Code. GWR's bankruptcy constituted an early termination event under the three interest rate swaps. Because interest rates generally declined between June 1990 and July 1992, the swaps entitled BofA to collect termination damages. BofA filed a claim in Thrifty's Chapter 11 case, seeking to collect $5,428,500 in ter-

mination damages due under the three swaps ("Swap Claim"). Thrifty, as guarantor of GWR's obligations under the swaps, objected to BofA's Swap Claim. Thrifty primarily argued that the Swap Claim constituted unmatured interest disallowed under Section 502(b)(2) of the Bankruptcy Code.

In February 1995 the Bankruptcy Court confirmed a Joint Plan of Reorganization (the "Plan") for Thrifty and its subsidiaries. Under the Plan, GWR's obligations to BofA under the term loan, other than those related to the disputed Swap Claim, were paid in full. A settlement agreement between BofA, GWR, Thrifty and others fixed the amount of BofA's Swap Claim against Thrifty, if allowed, at $5,428,500. The agreement preserved Thrifty's rights to object to allowance of the Swap Claim.

After discovery and on summary judgment, the Bankruptcy Court rejected Thrifty's objections and allowed the Swap Claim. *See In re Thrifty Oil Co.,* 212 B.R. 147, 154 (Bankr.S.D.Cal.1997). Thrifty filed a timely notice of appeal, vesting this Court with appellate jurisdiction under 28 U.S.C. § 158(a).

## III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure mandates entry of summary judgment where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. FED. R. CIV. P. 56(c); FED. R. BANK. P. 7056;[8] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548,

---

**7.** Although not material to the disposition of this appeal, the interest rate swaps did not entirely eliminate GWR's exposure to interest rate fluctuations. Under the interest rate swaps, BofA paid GWR a floating rate based on "LIBOR," the London Interbank Offered Rate. Under the term loan, however, GWR paid BofA a floating rate based on the "Reference Rate," defined in the term loan agreement as the higher of (1) the Federal Funds Rate plus 0.5%, and (2) the interest rate publicly announced by BofA as its reference rate.

Although LIBOR and the Reference Rate both measure short term interest rates, they do not always follow each other identically. Thus, GWR's "fixed" interest rate fluctuated nominally by the difference between LIBOR and the term loan's Reference Rate.

**8.** Rule 56 of the Federal Rules of Civil Procedure is incorporated and made applicable to bankruptcy proceedings pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure.

2552, 91 L.Ed.2d 265 (1986). A fact is "material" when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A "genuine issue" of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Where, as here, the case turns on a mixed question of fact and law and the only disputes relate to the legal significance of undisputed facts, the controversy collapses into a question of law suitable to disposition on summary judgment. *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir.1994); *Graham v. City of Chicago*, 828 F.Supp. 576, 583 (N.D.Ill.1993).

The district court reviews a bankruptcy court order granting summary judgment de novo. *Parker v. Community First Bank (In re Bakersfield Westar Ambulance, Inc.)*, 123 F.3d 1243, 1245 (9th Cir. 1997); *Corman v. Morgan (In re Morgan)*, 197 B.R. 892, 895 (N.D.Cal.1996). The district court may affirm on any ground supported by the record, even if it differs from the ground relied upon by the bankruptcy court. *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir.1996); *In re DeMasi*, 227 B.R. 586, 587 (D.R.I.1998).

## IV. DISCUSSION

Thrifty raises two arguments on appeal. First, Thrifty contends the Bankruptcy Court erred by concluding that BofA's Swap Claim did not constitute unmatured interest under Section 502(b)(2). Second, Thrifty argues the Bankruptcy Court erred by concluding the three interest rate swaps did not violate California's Bucket Shop Law. The Court will address each argument in turn.

### A. SECTION 502(B)(2), UNMATURED INTEREST AND INTEREST RATE SWAPS

As its primary argument on appeal, Thrifty claims the Bankruptcy Court erroneously concluded that BofA's Swap Claim did not constitute "unmatured interest" disallowed by Section 502(b)(2) of the Bankruptcy Code. Thrifty contends the three interest rate swaps provided by BofA converted GWR's floating rate term loan into the economic equivalent of a fixed-rate loan, thereby transforming the swap payments and termination damages into interest.

Section 502(b)(2) provides that, upon objection, the court shall allow a claim except to the extent "such claim is for unmatured interest." 11 U.S.C. § 502(b)(2). Interest is money "paid to compensate for the delay and risk involved in the ultimate repayment of monies loaned." *Texas Commerce Bank, N.A. v. Licht (In re Pengo Indus., Inc.)*, 962 F.2d 543, 546 (5th Cir.1992) ("*Pengo*"). Interest is "unmatured" when it was not yet due and payable at the time the debtor filed its bankruptcy petition. *Joyce v. Fidelity Consumer Discount Co. (In re Joyce)*, 41 B.R. 249, 254 (Bankr. E.D.Pa.1984).[9] Federal law, not state law, governs a creditor's entitlement to post-petition interest on a valid pre-petition claim. *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946) ("*Vanston*").

The rule curtailing the accrual of post-petition interest originated in the English bankruptcy system over two centuries ago.

---

**9.** The rule has several exceptions. For example, the Bankruptcy Code permits accrual of unmatured interest in favor of secured creditors or where the debtor proves solvent. 11 U.S.C. §§ 506(b), 726(a)(5). Federal courts have also permitted the accrual of interest on a nondischargeable debt during the pendency of bankruptcy. *Bruning v. United States*, 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964) (pre-Bankruptcy Code case). BofA does not argue that any of these exceptions applies here.

*See generally Sexton v. Dreyfus,* 219 U.S. 339, 344, 31 S.Ct. 256, 257, 55 L.Ed. 244 (1911) (discussing history of the rule). Today, the Bankruptcy Code maintains the rule to achieve fairness and administrative efficiency in bankruptcy cases. The most significant reasons for the rule include: (1) because a bankruptcy suspends a debtor's ability to pay its debts, requiring payment of post-petition interest penalizes the debtor for something over which it has no control; (2) denying post-petition interest saves the bankruptcy estate the inconvenience of continuously recalculating the amount due each creditor; and most importantly, (3) denying post-petition interest ensures that no party realizes a gain or suffers a loss due to the delays inherent in liquidation and distribution of the estate. *Vanston,* 329 U.S. at 162–63, 67 S.Ct. at 240–41; *Matter of Fesco Plastics Corp., Inc.,* 996 F.2d 152, 155 (7th Cir.1993).

Thrifty and BofA sharply disagree on the appropriate legal standard for determining whether the Swap Claim constitutes unmatured interest under Section 502(b)(2). Indeed, considering the statute's terse language, its sparse legislative history and the infinite variety of transactions that may trigger an unmatured interest objection, it is not surprising that federal courts have not articulated a precise set of rules for applying Section 502(b)(2). A few common principles, however, have emerged from the decisions that have applied the statute. In deciding whether a claim includes unmatured interest, federal courts generally focus on the substance of the claim, not its form, and may rely on evidence outside the parties' agreement. *See, e.g., Pengo,* 962 F.2d at 546; *In re Hidden Lake Ltd. Partnership,* 247 B.R. 722, 730 (Bankr.S.D.Ohio 2000); *Brown v.*

*Sayyah (In re ICH Corp.),* 230 B.R. 88, 93–94 (N.D.Tex.1999). Where the specific characteristics of a transaction create uncertainty as to whether a claim includes unmatured interest, federal courts do not base their decisions on economic theories of interest. Instead, they evaluate the transaction in light of the principles that underlie Section 502(b)(2) and the policies that flow throughout the Bankruptcy Code. *Cf. Vanston,* 329 U.S. at 165, 67 S.Ct. at 241 ("It is manifest that the touchstone of each decision on allowance of interest in bankruptcy ... has been a balance of equities between creditor and creditor or between creditors and the debtor"). For example, cases applying Section 502(b)(2) often turn on whether allowance or disallowance will contravene bankruptcy policy, unfairly prejudice other creditors or provide a windfall to the debtor. *LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.),* 961 F.2d 378, 382–83 (2d Cir.1992) (unmatured interest not found where disallowance would undermine bankruptcy policy of encouraging consensual out-of-court workouts); *Pengo,* 962 F.2d at 549 (same); *Hanna v. United States (In re Hanna),* 872 F.2d 829, 830–32 (8th Cir.1989) (refusing to classify post-petition penalties on nondischargeable tax debts as unmatured interest because disallowance would not further the policies that underpin Section 502(b)(2)); *Mt. Rushmore Hotel Corp. v. Commerce Bank (In re Mt. Rushmore Hotel Corp.),* 146 B.R. 33, 36 (Bankr.D.Kan. 1992) (refusing to disallow difference between the face amount of bonds and price paid by third-party transferees because disallowance would impede creditor's ability to sell bonds and provide windfall to bankruptcy debtor);[10] *In re Skyler Ridge,* 80 B.R. 500, 508 (Bankr.C.D.Cal.1987) (re-

---

**10.** Thrifty quotes a single sentence from *Mt. Rushmore Hotel Corp. v. Commerce Bank (In re Mt. Rushmore Hotel Corp.),* 146 B.R. 33 (Bankr.D.Kan.1992) (*"Mt.Rushmore "*) for the proposition that a court evaluating a Section 502(b)(2) objection must view the transaction from the debtor's point of view. (Thrifty's

fusing to disallow as unmatured interest claim for liquidated damages under mortgage contract in part because disallowance would further no bankruptcy policy); *cf. Bruning v. United States*, 376 U.S. 358, 363, 84 S.Ct. 906, 909, 11 L.Ed.2d 772 (1964) (holding that post-petition interest on nondischargeable tax debt remained a personal liability of the debtor after bankruptcy, finding "the reasons—and thus the rule—inapplicable").

### 1. SECTION 502(B)(2): ANALYSIS

■ Thrifty and BofA agree that periodic payments and termination damages do not involve interest under a "stand alone" interest rate swap, i.e., where the counterparties hold no underlying debt and enter into the swap to speculate on fluctuations in short-term interest rates. A fundamental characteristic of an interest rate swap is that the counterparties never actually loan or advance the notional amount. The swap involves an exchange of periodic payments calculated by reference to interest rates and a hypothetical notional amount. Payments made under an interest rate swap cannot possibly compensate for the delay and risk associated with borrowed money because no loan has taken place between the counterparties. The amount of net periodic payments exchanged under the swap, and the counter-

party entitled to receive them, depend on movements in short term interest rates that have no connection with any underlying loan. The damages due upon termination of the swap merely provide the replacement cost of the lost swap payments and likewise cannot represent interest, unmatured or otherwise.

Thrifty insists, however, that the payments under the three interest rate swaps provided by BofA constitute interest because the swaps and term loan, viewed together, formed an "integrated transaction" designed to provide GWR with fixed-rate financing. Thrifty identifies several characteristics establishing the integrated nature of the loan-swap transaction, including: (1) the aggregate notional amounts of the three interest rate swaps matched the principal amount of the initial $45 million borrowing; (2) the swaps had an amortization schedule that closely followed the payment schedule under the term loan; (3) the termination date for the swaps was the same as the maturity date of the term loan; (4) the swaps and term loan were cross-collateralized and cross-defaulted; (5) the term loan explicitly required GWR to enter into interest rate swaps to hedge the term loan's interest rate fluctuations; (6) the swaps and term loan made reference to each other; and, finally, (7) BofA provided both the term

---

Op. Br. at 25). This broad proposition, however, overstates the holding and distorts the reasoning of that case. *See, e.g., Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1578 (Fed.Cir.1988) ("Cases should not be cited for mere words. What counts is what the court did in a cited case").

The debtor in *Mt. Rushmore* issued $7 million in bonds at face value. The original purchaser of the bonds later resold them to a third party for $1.4 million, which represented a $5.6 million discount from the face value. The debtor subsequently filed for bankruptcy and objected to the third-party creditor's claim, arguing the $5.6 million discount con-

stituted interest. The bankruptcy court rejected this argument, reasoning:

> [W]hatever else it might mean, "interest" in § 502(b)(2) must mean interest from the debtor's point of view. The bondholders' purchase had no effect on the debtor's obligations under the bonds, except perhaps to change the entities to whom they are owed.

*Mt. Rushmore*, 146 B.R. at 34. The bankruptcy court's reference to "the debtor's point of view" merely illustrated that the third party bond transfer did not reduce the amount of the debtor's principal obligations. This concept has no relevance here because the BofA GWR interest rate swaps were not subject to third-party transfers.

loan and the interest rate swaps. According to Thrifty, these facts demonstrate that coupling the term loan with the three swaps transformed the floating-rate term loan into the economic equivalent of a fixed-rate loan, thereby converting the periodic swap payments into interest. The termination damages due upon GWR's default, Thrifty argues, constitute "unmatured" interest because they compensate BofA for the swap payments it would have received after the filing of GWR's bankruptcy petition. (Thrifty's Op. Br. at 11–14; 28–30).

Neither Thrifty nor its expert witness provides a coherent explanation as to how these allegedly "integrating" characteristics, individually or collectively, transform swap payments or termination damages into interest. A simple example unravels much of Thrifty's argument and demonstrates that the "integrating" characteristics of the GWR—BofA transaction have little, if any, relationship to whether swap payments constitute interest.

Imagine a situation where a borrower obtains fixed-rate financing by combining (1) a floating-rate loan provided by a bank, and (2) an interest rate swap provided by a separate swap dealer. As between the swap dealer and the borrower, the economics do not materially differ from the typical non-hedging interest rate swap described earlier. Because the swap dealer did not advance money to the borrower, swap payments made by the borrower cannot possibly compensate the swap dealer for the risk and delay associated with money the dealer never advanced. Depending on movements in short term interest rates, the borrower may receive net payments under the interest rate swap. The ability of net periodic payments under the swap to inure to the benefit of the borrower confirms their fundamental lack of connection with the risk and delay associated with loaned money. To the extent interest rate fluctuations require the borrower to make net payments under the swap, these payments represent the cost of obtaining a hedge against movements in interest rates and may contribute to the borrower's overall funding costs, but cannot possibly compensate for the risk and delay of the loan.

This conclusion obtains even where the parties "integrate" the transaction by customizing the interest rate swap to mimic the characteristics of the loan. For example, the borrower could match the notional amounts of the interest rate swap with the principal borrowed under the loan, synchronize the two instruments' amortization and payment schedules, coordinate their respective effective and termination dates, cross-default the two instruments and provide prepayment of the loan as a termination condition under the swap. Although these contractual enhancements enable the borrower to more closely achieve its overall financing goal, they do not change the nature of the periodic payments or the termination damages due upon default. As with a stand-alone swap, no advance of money has occurred between the swap counterparties. Floating interest rates fluctuate without regard to the borrower's loan, determining both the amount of the net periodic payments and the counterparty entitled to receive them. The close resemblance between this arrangement and fixed-rate financing merely confirms that the borrower has successfully exploited the flexibility of a derivative interest rate swap to achieve a specific financial objective. No matter how tightly the borrower integrates the swap with its loan, the payments made under the swap cannot represent interest.[11]

11. BofA's attorneys presented Thrifty's economic expert with this precise hypothetical during his deposition and asked whether the borrower's payments under the swaps would represent interest. Thrifty's expert testified that they would, even if the swap dealer did

Of course, in this case BofA provided *both* the loan and the three interest rate swaps, an arrangement that creates a theoretical possibility that the periodic swap payments form part of BofA's compensation for the risk and delay associated with the term loan. The question therefore becomes whether, or under what circumstances, BofA's dual role as lender and swap dealer converts GWR's periodic swap payments from derivative cash flows into interest on the term loan. As discussed above, the resolution of this issue does not turn on economic theories of interest, but on equitable principles and bankruptcy policy.[12] For the reasons expressed below, the Court cannot identify any bankruptcy policy that justifies treating BofA's claim for swap termination damages distinctly from a claim filed by a non-lending swap dealer, an almost identical situation that cannot implicate Section 502(b)(2) for the reasons stated earlier.

Several provisions in the Bankruptcy Code reflect a strong Congressional policy of protecting interest rate swaps, termination damages and the swap market from the effects of bankruptcy. In 1990, Congress amended the Bankruptcy Code to exempt interest rate swaps from provisions which could otherwise frustrate a creditor-counterparty's ability to exercise the contractual rights conferred by an interest rate swap agreement. *See* Act of June 25, 1990, Pub.L. No. 101–311, 104 Stat. 267 (1990) ("Swap Amendments"). The legislative history of the Swap Amendments plainly reveals that Congress recognized the growing importance of interest rate swaps and sought to immunize the swap market from the legal risks of bankruptcy. The Judiciary Committee Report to the Senate version of the bill observed that swap agreements are "a rapidly growing and vital risk management tool in world financial markets," frequently used by financial institutions and corporations "to minimize exposure to adverse changes in interest . . . rates." S.Rep. No. 101–285, at 3 (May 14, 1990). Representative Schumer explained that swap agreements "offer borrowers the ability to carefully manage the interest rate or currency risks they undertake, making it easier and safer for companies . . . to raise the capital necessary for economic growth." 136 Cong. Rec. H2284 (May 15, 1990). The House Judiciary Committee Report confirms that Congress enacted the Swap Amendments to

---

not advance any money and had no awareness of the underlying loan. (BofA Ex. A at 19–21). Two erroneous assumptions that flow throughout Thrifty's briefs explain this remarkable, and plainly incorrect, response.

First, Thrifty apparently assumes that "interest" includes every expense a borrower incurs in connection with its financing. For example, Thrifty's expert opined that payments a borrower makes under an interest rate swap that hedges a loan represent "interest" because the payments "constitute a portion of the interest rate debt service obligations resulting from that loan," (Thrifty Ex. 14 at 12, 69), or in other words, the price a borrower pays to eliminate interest rate fluctuations on its loan. Thrifty's opening brief argues that payments under the BofA—GWR interest rate swaps constitute interest because they repre-

sent "the 'price' that GWR paid BofA to obtain a fixed rate for the entire transaction." (Thrifty's Op. Br. at 28:9–12). These contentions lack merit for the reasons stated in the text; the "price" a borrower pays for an interest rate swap may contribute to overall funding costs but does not necessarily comprise that element of the borrower's funding costs attributable to interest.

Second, Thrifty's arguments assume that a court considering a Section 502(b)(2) objection must view the transaction from the debtor's perspective. (Thrifty's Op. Br. at 24–25). As discussed more fully in footnote 10, *supra*, Thrifty derives this argument from an overbroad reading of *Mt. Rushmore Hotel Corp. v. Commerce Bank*, 146 B.R. 33, 34 (Bankr. D.Kan.1992).

**12.** *See* Part IV.A, *supra*.

ensure that the swap markets "are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code." H.R.Rep. No. 101–484, at 1 (May 14, 1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 223; *accord* 136 Cong. Rec. H2281, 2283 (May 15, 1990) (remarks of Rep. Fish) ("The swap market serves essential functions today—including reducing vulnerability to fluctuations in exchange and interest rates. Explicit Bankruptcy Code references to swap agreements will remove ambiguities that undermine the swap market."); 136 Cong. Rec. S7535 (remarks of Sen. DeConcini) ("The effect of the swap provisions will be to provide certainty for swap transactions and thereby stabilize domestic markets by allowing the terms of the swap agreement to apply notwithstanding the bankruptcy filing"). Congress addressed these concerns by bestowing preferential treatment on the creditor-counterparty who seeks to terminate a swap agreement and collect termination damages from the bankruptcy debtor.[13] Although the Swap Amendments do not directly address the relationship between interest rate swaps and unmatured interest, they provide two policy principles applicable to the interpretation or application of any Bankruptcy Code provision, including Section 502(b)(2). At a minimum, federal courts should avoid interpreting or applying Section 502(b)(2) in a way that would either (1) needlessly discourage the innovation and flexibility that has made interest rate swaps such a valuable risk management and financial

tool, or (2) inject unnecessary legal uncertainty into the swap markets.

Indeed, both parties agree that it is common for a borrower to obtain an interest rate swap from its lender. In many instances, the lender has already performed an analysis of the borrower's creditworthiness and gained a detailed understanding of its financial affairs. This acquired familiarity places the lender in a superior position to customize the terms of a derivative transaction to fulfill the borrower's financial objectives. The borrower may wish to enhance the business relationship with its lender and avoid the expense and delay of dealing with an unfamiliar financial institution. *See* Christian A. Johnson, *At the Intersection of Bank Finance and Derivatives: Who has the Right of Way?*, 66 Tenn. L.Rev. 1, 26–27 (1998) ("As such, borrowers are a natural choice with whom to engage in derivative transactions"). In addition, the involvement of a single financial institution simplifies collateralization of the swap obligations—a common requirement for less creditworthy counterparties—by permitting the borrower to more easily pledge the same collateral for both the swap and loan obligations.[14] In the event of a borrower's default, the lender will have additional flexibility in averting litigation and negotiating with the borrower in the absence of a competing claim from a third-party swap dealer. In sum, a borrower that obtains an interest rate swap from its lender often avoids many of the complexities, costs and inefficiencies associat-

---

**13.** For example, the Swap Amendments exempt from the automatic stay the creditor's rights to terminate a swap, setoff mutual obligations and net out termination damages, and immunize swap periodic payments from avoidance as preferences or fraudulent transfers. *See, e.g.,* 11 U.S.C. §§ 362(b)(17), 546(g), 548(d), 560; *see generally* S. Tucker, Comment, *Interest Rate Swaps and the 1990*

*Amendments to the United States Bankruptcy Code: A Measure of Certainty Within Swap Market Contracts*, 1991 Utah L.Rev. 581, 593–97 (1991).

**14.** To the extent the collateral does not cover the termination damages due upon the borrower's default, the lender retains an unsecured claim against the borrower.

ed with obtaining a swap from an unfamiliar third-party dealer.

Thrifty argues that permitting lenders to collect termination damages from a bankrupt borrower would encourage the manipulative use of interest rate swaps to circumvent Section 502(b)(2). According to Thrifty, a decision in BofA's favor would invite lenders to eliminate fixed-rate loans entirely and offer only floating-rate loans coupled with interest rate swaps. Once a borrower files its bankruptcy petition, the lender could collect termination damages under the swap—the equivalent of unmatured interest on an unsecured claim—notwithstanding Section 502(b)(2).[15]

Although intuitively appealing, this argument neglects several characteristics of bona fide interest rate swaps, swap dealers and swap markets which significantly reduce, and perhaps eliminate, these concerns. First, a lender that provides an interest rate swap to its borrower cannot determine whether it will receive termination damages because it cannot foretell future interest rate fluctuations or the date the borrower may default.[16] Second, a bona fide swap dealer does not derive its revenue from the periodic swap payments, but rather from the spread between the interest rates the dealer pays and receives under the interest rate swap. Upon commencement, the dealer incorporates the swap into its portfolio and immediately hedges it against other instruments or transactions which exhibit opposite economic characteristics. (BofA Ex. O at 30–31). Thus, if interest rate fluctuations require the borrower to make net periodic payments to the swap dealer, the dealer's portfolio suffers an approximately equivalent loss on the transactions hedging the borrower's swap. A borrower's default deprives the portfolio of the periodic payments under the swap, requiring the dealer to either acquire another hedge to replace the terminated swap or remove the transactions hedging the swap from the portfolio. Even with its favored treatment in bankruptcy, the dealer has no assurance it can recover sufficient termination damages to rebalance its portfolio, particularly where the borrower has pledged insufficient collateral. Finally, where the lender-dealer syndicates significant portions of the term loan yet retains the whole of the interest rate swap obligations, it receives only a portion of the interest payments on the loan yet incurs all of the risk associated with the swaps. If interest rates move against the dealer, the swap agreement may require the lender to make net periodic payments to its borrower exceeding the interest payments it receives under the term loan. In sum, the uncertainties of interest rate movements, the risks pre-

---

**15.** Thrifty also argues that a decision in BofA's favor would encourage lenders to circumvent state usury law by entering into floating-rate loans at lower interest rates and coupling them with interest rate swaps at unlawfully high fixed rates. However, an objection based on state usury law falls more appropriately under Section 502(b)(1), which disallows any claim unenforceable under applicable nonbankruptcy law. 11 U.S.C. § 502(b)(1); *Household Fin. Corp. v. Swartz (In re Swartz)*, 37 B.R. 776, 777–78 (Bankr. D.R.I.1984) (evaluating usury objection under Section 502(b)(1) and applicable state law). Thrifty does not argue or even suggest that California usury laws render any provision of the term loan or interest rate swaps unenforceable, and Thrifty concedes that BofA is an exempt lender. The Court therefore declines to analyze the policy implications of state usury laws that clearly do not apply to this case.

**16.** The argument that interest rate swaps provide a mechanism for evading Section 502(b)(2) becomes even more tenuous where the swap permits the bankrupt counterparty to collect termination damages. The interest rate swap agreements in this case, however, restrict collection of termination damages to the non-defaulting counterparty.

sented by incorporating a swap into the dealer's portfolio and the intricacies of syndicated loan transactions make it exceedingly unlikely that a financial institution could create a profitable enterprise of systemically using interest rate swaps to circumvent Section 502(b)(2).

Moreover, the speculative possibility that a lender could use interest rate swaps to evade Section 502(b)(2) does not overcome the strong Congressional policy of encouraging the innovative use of interest rate swaps, or justify eschewing the benefits available to counterparties who obtain swaps from their lenders. A case where such abuse could occur would involve, for example, a lender that does not maintain a swap portfolio, an unsophisticated borrower, non-standard swap documentation or artificially inflated swap pricing. However, where the lender provides a standard interest rate swap to a sophisticated borrower and the swap serves a legitimate non-bankruptcy purpose, the lender's claim for termination damages is, for all purposes, indistinguishable from a claim filed by a non-lending swap dealer. Allowing the lender to collect termination damages in such a case offends none of the principles and policies of Section 502(b)(2).

The three interest rate swaps in this case clearly meet these requirements. First, the swaps were documented using industry-standard ISDA Master Agreements and swap confirmations. (BofA Ex. O at 53; Thrifty Ex. 22 at 2). The swaps had the characteristics of typical and ordinary interest rate swaps in 1990, including payment netting, closeout netting, calculation of termination damages by market

quotation, and a limitation of termination damage recovery to the non-defaulting parties. (BofA Ex. O at 50).[17] The pricing of each swap followed standard market pricing for amortizing interest rate swaps with counterparties of GWR's size, credit quality and market presence. (*Id.*). BofA incorporated the three interest rate swaps into its portfolio and hedged them against treasury notes and futures contracts. (Thrifty Ex. 19¶¶ 3, 8; Thrifty Ex. 20 ¶¶ 2, 9, 16). Thus, BofA's dual role as lender and swap dealer had no material effect on the terms, pricing or treatment of the three interest rate swaps.[18] (Thrifty Ex. 20 at 5; Thrifty Ex. 22 at 2; Thrifty Ex. 33 at 4–6). Nothing in the record suggests BofA altered the swap pricing or terms to provide additional compensation for the term loan, or to enhance its prospects of collecting termination damages in the event of bankruptcy.

Second, the Court finds nothing unusual about the "integrating" features of the interest rate swaps, including notional amounts matched to the initial borrowing under the term loan, synchronized amortization and payment schedules, coordinated commencement and termination dates and cross-default provisions. As discussed previously, these provisions do not affect the derivative nature of net periodic swap payments or termination damages, and are common for interest rate swaps aimed at eliminating the interest rate risk from a particular debt. Moreover, the Court finds it anomalous that BofA's position as a bankruptcy creditor would suffer for having provided a customized swap agreement

17. According to BofA's expert,"[t]he restriction of termination damages to the non-defaulting party is the only significant term of the [BofA—GWR interest rate swaps entered into in 1990] which is not typical of interest rate swaps entered into in today's market." (BofA Ex. O at 50 n. 15).

18. Indeed, GWR asked for—and received— the right to obtain the swaps up to six months after the closing of the loan, from any suitable swap dealer. (BofA Ex. B. ¶ 11(c)). GWR's Chief Financial Officer admitted that he sought the right to swap with another swap dealer "[t]o keep BofA honest in pricing the swaps." (Thrifty Ex. 33¶ 10).

precisely tailored to GWR's financial objectives.[19]

Third, the interest rate swaps clearly served a legitimate nonbankruptcy purpose: to provide GWR with the equivalent of fixed-rate financing. The undisputed evidence confirms that, due to GWR's creditworthiness and the inability to syndicate a large fixed-rate loan, BofA would not have provided $45 million in conventional fixed-rate financing to GWR. (Thrifty Ex. 21 ¶¶ 6–8; BofA Ex. J at 8). As the Bankruptcy Court observed, combining the floating-rate term loan with the three interest rate swaps furnished GWR with the equivalent of fixed-rate borrowing, while BofA retained the benefits of a marketable floating-rate loan capable of syndication. *See Thrifty Oil Co.*, 212 B.R. at 153. Obtaining more desirable financing characteristics represents one of the quintessential purposes of an interest rate swap.[20]

Finally, the undisputed evidence in the record uniformly points away from a disguised transaction or subterfuge. The record is replete with evidence establishing that BofA candidly disclosed, and GWR fully understood, that GWR would receive a floating-rate loan coupled with separate interest rate swaps—not a conventional fixed-rate loan. (BofA Ex. A at 15–16, 24; BofA Ex. J at 5, 10–12; Thrifty Ex. 33¶ 8; Thrifty Ex. 18 at 2–3). GWR understood the benefits and risks of using interest rate swaps, and there is no evidence that bankruptcy treatment influenced any aspect of this transaction.

Thus, the Court concludes that the Bankruptcy Court properly rejected Thrifty's Section 502(b)(2) objection.[21]

**19.** Aside from providing courts with an exceptionally weak decisional tool for Section 502(b)(2), relying on the "integrating" features would discourage lenders from providing useful, customized interest rate swaps to their borrowers. Following Thrifty's "integration" argument, a lender could defeat a Section 502(b)(2) objection by (1) including start and termination dates that differ from the commencement and maturity dates of the loan, (2) refusing to match the notional amounts with principal borrowed under the loan, (3) using a floating rate for the swap different from the floating rate paid under the loan, and (4) implementing a swap amortization schedule materially different from the loan payment schedule. No bankruptcy policy supports a legal standard that encourages lenders to introduce such meaningless inefficiencies into swap agreements.

**20.** In fact, the House Report for the Swap Amendments includes an example of a borrower who exploits an interest rate swap to create synthetic fixed-rate debt:

A corporation typically enters into swap agreements in order to obtain more advantageous interest ... rates that are not available to it through conventional means. For example, because of low credit ratings, a company may not be able to obtain long-term, fixed-rate financing at acceptable rates. Instead, it may have to settle for more volatile, short-term floating rates that can expose it to uncertain interest rate costs over the life of the loan. To counter this risk, the company may, by paying a high premium, enter into agreements with a financial institution to "swap" the short-term floating rates for more favorable long-term rates. The financial institution may, in turn, enter into other swap arrangements to minimize its own exposure to risk.

*See* H.R.Rep. No. 101–484, at 3 (May 14, 1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 225.

**21.** The Court rejects Thrifty's contention that the Bankruptcy Court ignored disputed material facts in granting summary judgment. The Bankruptcy Court aptly observed that "many of [Thrifty's] claimed factual disputes are really legal questions [, and] many of the alleged 'disputed' facts are nonmaterial." *Thrifty Oil Co.*, 212 B.R. at 149. Indeed, Thrifty's "disputes" with BofA fall into three categories: (a) quarrels over the appropriate legal standard under Section 502(b)(2), (b) disagreements over the legal significance of undisputed material facts, and (c) disputes over immaterial facts. Because these alleged disputes do not raise a genuine issue for trial, the Bankruptcy Court properly resolved Thrifty's Section 502(b)(2) objection on summary judgment. *See, e.g., Union Sch. Dist. v.*

## B. California's Bucket Shop Law

As its second argument, Thrifty claims the bankruptcy court erred in finding that the interest rate swaps did not violate California's Bucket Shop Law. *See* Cal. Corp.Code §§ 29000 *et seq.* Thrifty contends the bankruptcy court should have found the interest rate swaps unenforceable and disallowed the Swap Claim.

### 1. Bucket Shop Laws—Background

The term "bucket shop" refers to an illegitimate gambling operation, common at the end of the nineteenth century, that permitted investors to place bets based upon fluctuations in the market prices of stocks and commodities. *See, e.g., Bryant v. Western Union Telegraph Co.,* 17 F. 825, 828 (C.C.D.Ky.1883). In 1906, the Supreme Court described a bucket shop as "an establishment, nominally for the transaction of a stock exchange business, or business of similar character, but really for the registration of bets, or wagers, usually for small amounts, on the rise or fall of the prices of stocks, grain, oil, etc., there being no transfer or delivery of the stock or commodities nominally dealt in." *Gatewood v. North Carolina,* 203 U.S. 531, 536, 27 S.Ct. 167, 168, 51 L.Ed. 305 (1906); *Joslyn v. Downing, Hopkins & Co.,* 150 F. 317, 318 (9th Cir.1906) (describing typical early twentieth-century bucket shop). Because the stock and commodity purchases were entirely fictitious, bucket shops frequently assumed the risk of fluctuations in market prices. *See generally* William L. Stein, *The Exchange–Trading Requirement of the Commodity Exchange Act,* 41 Vand. L.Rev. 473, 477 (1988). If prices moved significantly against a bucket shop's position, the shop would often close its doors or file for bankruptcy, leaving behind uncollectible debts. *Id.*

Many states, including California, responded to these perceived abuses by enacting statutes designed to eradicate bucket shops. California's Bucket Shop Law, enacted in 1923, defines "bucketing" or "bucket shopping" as contracting for the sale or purchase of securities or commodities, where the parties intend to settle the contract according to public market price quotations, but without a bona fide sale or purchase. *See* Cal. Corp.Code § 29008(a–c). The statute imposes criminal penalties on those who operate or assist in the operation of a bucket shop. *See* Cal. Corp. Code §§ 29100 & 29101; *see generally People v. Gardner,* 72 Cal.App.3d 641, 644–46, 140 Cal.Rptr. 238, 240–42 (Cal.Ct.App. 1977). Here, Thrifty seeks to invalidate the three interest rate swaps because the periodic payments under the swaps allegedly involved the sale and purchase of fictitious debt obligations that meet the Bucket Shop Law's statutory definition of a security or commodity.

BofA responds with two arguments. First, BofA asserts that state bucket shop laws were expressly preempted by a 1992 amendment to the Commodities Exchange Act, 7 U.S.C. § 1 *et seq.* Second, BofA argues that California's Bucket Shop Law does not apply because the interest rate swaps obligated both parties to perform, did not involve a fictitious transaction and did not relate to the purchase or sale of a security or commodity. Because the Court agrees with BofA's former argument, it need not address the latter.

### 2. The Futures Trading Practices Act Of 1992 And Preemption Of State Bucket Shop Laws

As discussed in the previous section, market-wide concerns over the treatment

*Smith,* 15 F.3d 1519, 1523 (9th Cir.1994); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contrac-*

*tors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

of swap agreements in bankruptcy led Congress to enact the Swap Amendments, which removed much of the legal uncertainty that loomed over the rights of non-debtor swap counterparties in bankruptcy. Two years later, similar concerns prompted Congress to enact the Futures Trading Practices Act of 1992 ("FTPA"), which sought to eliminate uncertainties surrounding application of the Commodities Exchange Act ("CEA") to several innovative financial instruments, including swaps. *See* Pub.L. No. 102–546, 106 Stat. 3590 (1992). The FTPA empowered the Commodities Futures Trading Commission ("CFTC"), the administrative agency charged with administering the CEA, to exempt specific instruments and transactions from coverage under the CEA. Specifically, Section 502(a) of the FTPA added Section 4(c) to the CEA, authorizing the CFTC to immediately adopt an exemption for swap agreements. 7 U.S.C. § 6(c)(5)(B). The House Conference Committee Report explained:

> The goal of providing the Commission with broad exemptive powers is not to provide a wide-scale deregulation of markets falling within the ambit of the [CEA]. Rather, it is to give the Commission a means of providing certainty and stability to existing and emerging markets so that financial innovation and market development can proceed in an effective and competitive manner....
>
> [T]he Conferees expect and strongly encourage the Commission to use its exemptive powers promptly upon enact-

ment of this legislation in four areas where significant concerns of legal uncertainty have arisen: (1) hybrids, (2) swaps, (3) forwards, and (4) bank deposits and accounts.

H.R. Conf. Rep. No. 102–978, at 81 (Oct. 2, 1992), *reprinted in* 1992 U.S.C.C.A.N. 3179, 3213.[22] In January 1993 the CFTC, exercising its exemptive authority and following this directive, promulgated regulations exempting eligible swap agreements from CEA coverage. *See* Exemption for Certain Swap Agreements, 58 Fed.Reg. 5,587 (1993) (codified in 17 C.F.R. Part 35) ("Swap Exemption"). The Swap Exemption applies retroactively to swap agreements entered into on or after October 23, 1974. *See* 17 C.F.R. § 35.1(a).[23]

The FTPA also sought to remove the legal uncertainty created by state bucket shop laws. Section 502(c) of the FTPA amended Section 12(e)(2) of the CEA to preempt state bucket shop laws as applied to any "transaction or class of transactions that has received or is covered by the terms of any exemption previously granted by the [CFTC] under [Section 4(c) ]." 7 U.S.C. § 16(e)(2)(A). As explained by the House Conference Committee Report:

> Section 502(c) of the [FTPA] amends section 12(e)(2)(A) of the [CEA] to provide that any State or local law that prohibits or regulates gaming or the operation of "bucket shops" (other than anti-fraud provisions of general applicability) shall not apply with respect to a transaction or class of transactions that

---

**22.** Upon signing the FTPA, the President expressed similar concerns: "The bill also gives the Commodity Futures Trading Commission (CFTC) exemptive authority to remove the cloud of legal uncertainty over the financial instruments known as swap agreements. This uncertainty has threatened to disrupt the huge, global market for these transactions." *See* Statement by President George Bush Upon Signing H.R. 707, 28 Weekly Comp.

Pres. Doc. 2185 (Oct. 28, 1992), *reprinted in* 1992 U.S.C.C.A.N. 3219.

**23.** The October 23, 1974, date was selected because it corresponds with the enactment date of the Commodities Futures Trading Commission Act of 1974, the statute that established the CFTC. *See* Pub.L. No. 93–463, 88 Stat. 1389 (1974).

has received or is covered by an exemption granted by the Commission under section 4(c). It thus provides legal certainty under both the [CEA] and state gaming and bucket shop laws for transactions covered by the terms of an exemption.

H.R. Conf. Rep. No. 102–978, at 80 (Oct. 2, 1992), *reprinted in* 1992 U.S.C.C.A.N. 3179, 3212. In other words, where the CFTC exempts transactions from the CEA pursuant to Section 4(c), those same transactions benefit from preemption of state bucket shop laws under Section 12(e)(2)(A). Thus, Section 12(e)(2)(A) preempts state bucket shop laws as to swap agreements covered by the Swap Exemption.

### 3. RETROACTIVITY OF THE FTPA PREEMPTION

■ Thrifty does not dispute that the three GWR—BofA interest rate swaps meet the specific eligibility requirements of the Swap Exemption. 17 C.F.R. §§ 35.1(b)(1)-(b)(2) & 35.2 (detailing requirements for the exemption); *Procter & Gamble Co. v. Bankers Trust Co.*, 925 F.Supp. 1270, 1285 (S.D.Ohio 1996) (discussing criteria for Swap Exemption). However, Thrifty contends the FTPA does not retroactively preempt state bucket shop laws as applied to swap agreements entered into and terminated before the enactment date of the FTPA. Thrifty relies on the language of Section 12(e)(2), which preempts state bucket shop laws as applied to "a transaction or class of transactions that has received or is covered by the terms of any exemption *previously granted* by the Commission under [Section 4(c) ]." 7 U.S.C. § 16(e)(2)(A) (emphasis added). Thrifty claims the phrase "previously granted" limits the preemptive effect of the Swap Exemption to swap agreements entered into or terminated after October 1992, the enactment date of the FTPA. Because the three interest rate swaps here terminated before October 1992, Thrifty contends, California's Bucket Shop Law still applies to them.

In interpreting a federal statute, the Court must first determine whether the language is clear and unambiguous, and if so, apply it as written. *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997). The Court must consider "not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme." *Holloway v. United States*, 526 U.S. 1, 6, 119 S.Ct. 966, 969, 143 L.Ed.2d 1 (1999) (internal quotations omitted). If the Court finds the statute ambiguous, it may then look to legislative history to aid in the interpretation. *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984).

For several reasons, the Court finds Thrifty's interpretation of the FTPA's preemption provision unsupported by the statute's language, structure or legislative history. First, the Court finds the phrase "previously granted," in Section 12(e)(2)(A) and within the context of the FTPA, hopelessly ambiguous. The statute provides no guidance as to whether this phrase requires a temporal sequence of events, nor does it identify any event or events the CFTC exemption must precede. Section 12(e)(2)(A) broadly covers any exempted "transaction or class of transactions," indicating that it does not turn on the execution or termination dates of any specific transaction. If the enactment date of the FTPA served as the temporal pivot for

Section 12(e)(2)(A), as Thrifty suggests, an absurdity would result; the CFTC could not possibly have granted exemptions under Section 4(c) "previous[ ]" to the enactment of the FTPA, because Section 4(c) was part of the FTPA.

Second, other provisions of the FTPA plainly reveal that Congress sought to encourage—if not require—retroactive treatment of swap agreements. Section 12(e)(2)(A) refers to the CFTC's authority under Section 4(c), which empowers the agency to exempt a transaction or class of transactions "for stated periods and either retroactively or prospectively, or both[.]" 7 U.S.C. § 6(c)(1). A more specific subdivision in Section 4(c) encourages the CFTC to promptly promulgate an exemption for swap agreements, provided the exemption is "effective as of October 23, 1974[.]" 7 U.S.C. § 6(c)(5)(B). In other words, Congress authorized the CFTC to promulgate retroactive exemptions, but expressed a specific desire for retroactivity as applied to swaps.

The CFTC followed this directive in promulgating the Swap Exemption, noting that retroactivity was necessary "to implement Congressional intent that the exemption from the [CEA] be available for all eligible swap agreements, regardless of when (subsequent to October 23, 1974) the agreements may have been entered into." *See* 58 Fed.Reg. 5,587, 5,588 (1993).[24] Given the clear desire for retroactivity expressed in Section 4(c) and reflected in the Swap Exemption, the Court finds it exceedingly unlikely that Congress intended

to abrogate retroactive preemption in Section 12(e)(2)(A) by using the ambiguous phrase "previously granted."

Finally, the legislative history of the FTPA undermines Thrifty's argument. As discussed above, Congress intended Section 12(e)(2)(A) to "provide legal certainty under both the [CEA] and state gaming and bucket shop laws for transactions covered by the terms of an exemption." H.R. Conf. Rep. No. 102–978, at 80 (Oct. 2, 1992), *reprinted in* 1992 U.S.C.C.A.N. 3179, 3212. In other words, Congress intended the CFTC's exemptive authority to simultaneously eliminate the legal uncertainty created by the CEA and state bucket shop laws. Construing the FTPA to permit retroactive exemption from the CEA but only prospective preemption of state bucket laws would create a layer of legal uncertainty where none existed before. Counterparties with long-term swap agreements entered into prior to October 1992, perhaps subject to amendments or modifications, could not determine with certainty whether their swaps would benefit from the FTPA's preemption of state bucket shop laws. Nothing in the FTPA's legislative history suggests Congress intended such an anomalous result.

For these reasons, the Court holds that the FTPA's language, structure and legislative history compel the conclusion that Congress preempted state bucket shop laws to the full extent the CFTC exempts transactions from coverage under the

---

**24.** The CFTC's final Swap Exemption indicates that the agency did not perceive any distinction between its authority under Section 4(c) and the preemptive force of its exemptions under Section 12(e)(2)(A). *See* 58 Fed.Reg. 5,587, 5,588 & n. 12 (1993). The CFTC's opinion as to the scope and interpretation of the CEA receives considerable deference. *See, e.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S.

837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (holding that federal courts must generally accept administrative agency's interpretation of ambiguous statute); *Krommenhoek v. A–Mark Precious Metals, Inc. (In re Bybee),* 945 F.2d 309, 314–15 (9th Cir. 1991) (holding that federal courts generally give "great deference" to CFTC interpretations of the CEA).

CEA. Thus, the Swap Exemption preempts state bucket shop laws as to covered swap agreements entered into on or after October 23, 1974. Because GWR and BofA entered into the three interest rate swap agreements after this date, they are not subject to California's Bucket Shop Law, and the Bankruptcy Court did not err in rejecting this objection.

## V. CONCLUSION AND ORDER

For the reasons set forth above, the Court AFFIRMS the judgment of the Bankruptcy Court. Each party shall bear its own costs. The Clerk of Court shall close the district court case file."

Bank of America ("BofA") seeks an award of attorney's fees incurred in connection with this appeal.[1] Thrifty disputes BofA's eligibility for attorney's fees, arguing that BofA waived its right to fees in a settlement agreement entered into during proceedings in the bankruptcy court. Thrifty also argues that even if BofA did not waive its right to attorney's fees, fees should not be awarded because the primary issues on appeal were based on federal, rather than state, law.

Thrifty contends that BofA waived its right to seek attorney's fees when it entered into a settlement agreement that provided, *inter alia,* "[i]n full satisfaction of any and all post-Petition Date claims against the Debtors ... the Debtors shall have no liability for post-Petition Date [attorney's fee] expenditures." However, the Swap Claim is a *pre*-Petition claim and is not subject to this waiver. *See In re Healthco Int'l, Inc.,* 272 B.R. 510, 512 (B.A.P. 1st Cir.2002) ("[C]laims founded on executed prepetition contracts are prepetition claims."). Accordingly, we reject

Thrifty's waiver argument and consider the merits of BofA's request for fees.

Attorney's fees may be awarded to an unsecured creditor in a bankruptcy proceeding only to the extent that state law governs the substantive issues and authorizes the court to award fees. *Renfrow v. Draper,* 232 F.3d 688, 694 (9th Cir.2000). In *Renfrow,* a creditor, the debtor's former wife, successfully sought a judgment that certain debts were nondischargeable. 232 F.3d at 694. In order to prove nondischargeability, the creditor was required to demonstrate the validity of the parties' divorce decree, which assigned the debts at issue to the debtor. *Id.* After judgment was entered in the creditor's favor, she sought attorney's fees pursuant to a "hold harmless" provision in the divorce decree. *Id.* at 691. We held that the creditor was entitled to the portion of attorney's fees incurred in connection with litigating state law issues; namely, the validity and amount of debts owed to her under the divorce decree. *Id.* at 694.

Under *Renfrow,* a creditor can recover attorney's fees incurred in connection with litigating the validity of a contract, even if the ultimate issue in the case is one of bankruptcy law. By contrast, the mere presence of an attorney's fees provision in the contract giving rise to the debt at issue does not entitle a prevailing party to attorney's fees. *See In re Hashemi,* 104 F.3d 1122, 1127 (9th Cir.1996) ("[T]he question of the applicability of the bankruptcy laws to particular contracts is not a question of the enforceability of a contract but rather involves a unique, separate area of federal law.") (citing *In re Coast Trading Co.,* 744 F.2d 686, 693 (9th Cir.1984)). Our past cases awarding attorney's fees to prevail-

---

1. BofA's claim for attorney's fees arises out of a contract between the parties, which requires the "defaulting party" to pay attorney's fees incurred "by reason of the enforcement or protection of its rights under this Agree-

ment." Thrifty does not dispute the validity of this contractual provision, nor does Thrifty dispute that it is a defaulting party within the meaning of the contract.

ing debtors conform to the same basic principles. *See In re Baroff,* 105 F.3d 439, 440–42 (9th Cir.1997) (awarding fees incurred by a prevailing party debtor in defending a state law fraudulent inducement claim, but refusing to award fees incurred in connection with a related issue of bankruptcy law).

*Renfrow, Hashemi,* and *Baroff* permit a prevailing party in a bankruptcy proceeding to receive attorney's fees incurred while litigating the enforceability of a contract. The California Bucket Shop law, if applicable, would have rendered the Swap Claim at issue unenforceable. We therefore conclude that BofA is entitled to attorney's fees incurred in connection with its successful defense of Thrifty's Bucket Shop objection on appeal.

Thrifty's § 502(b) objection, by contrast, was purely an issue of federal bankruptcy law. *See Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 163, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (holding that when, and under what circumstances, federal courts will allow interest on claims against debtor's estates has long been decided by federal law). Thus, the issue of attorney's fees in a § 502(b) case would ordinarily be a straightforward issue; because § 502(b) is exclusively governed by federal law, no fees could ordinarily be awarded to a prevailing party, absent a bankruptcy statute to the contrary.

The instant case, however, is somewhat atypical because, even though state law was irrelevant to the § 502(b) issue, the district court specifically requested that the parties brief issues of state contract law. The parties did so, and even though the district court ultimately decided the issue on purely federal grounds, the parties' appellate briefs repeatedly reference state contract law.

Despite the district court's error, we believe that a prevailing party should not be entitled to attorney's fees for litigation of state law issues merely tangential to an issue of federal bankruptcy law. This conclusion is consistent with our prior cases, in which we have awarded attorney's fees to prevailing bankruptcy parties only where the validity or enforceability of a contract was expressly at issue. Here, even though the parties were misled by the district court's order to brief issues of state contract law, neither validity nor enforceability of the Swap Agreement was ever a true component of the § 502(b) issue.

For the foregoing reasons, we GRANT Bank of America's petition for attorney's fees with respect to fees incurred litigating the California Bucket Shop issue, and DENY the petition with respect to fees incurred litigating the § 502(b) issue. The case is referred to the Appellate Commissioner for a determination of the level of fees incurred by BofA in litigating the Bucket Shop issue on appeal. The Commissioner is authorized to enter a judgment for that amount against Thrifty.