Dear Senator Gumm,
¶ 0 This office has received your request for an official Attorney General Opinion, in which you ask the following question:
 Are Oklahoma school districts authorized to enter into an interest rate swap with a bank or other financial institution?
 Background Oklahoma School Districts' Authority And Powers
¶ 1 Oklahoma school districts are created by state statute and derive their power and authority from those statutes. "Every school district shall be a body corporate and . . . be capable of contracting and being contracted with . . . as authorized by law." 70 O.S. 2001, § 5-105[70-5-105].
¶ 2 The powers and duties of a board of education are set forth in considerable detail at 70 O.S. Supp. 2005, § 5-117[70-5-117], which makes no specific reference to interest rate swaps. Section 5-117 in pertinent part states:
 A. The board of education of each school district shall have power to:
. . . .
 3. Maintain and operate a complete public school system of such character as the board of education shall deem best suited to the needs of the school district; [and]
. . . .
 21. Perform all functions necessary to the administration of a school district in Oklahoma as specified in the Oklahoma School Code, and in addition thereto, those powers necessarily implied but not delegated by law to any other agency or official[.]
Id.
¶ 3 Oklahoma courts have said:
 The independent school districts of this state also possess those powers implied in or necessarily incidental to the exercise of the express powers granted by statute:
 The school board has and can exercise those powers that are granted in express words; those fairly implied in or necessarily incidental to the powers expressly granted, and those essential to the declared objects and purposes of the corporation.
Okla. Sports Prop., Inc. v. Indep. Sch. Dist. # 11,957 P.2d 137, 139 (Okla.Ct.App. 1998) (citations omitted).
 Interest Rate Swaps
¶ 4 Interest rate swap contracts are a form of derivative financial instruments. A 1995 article in the University ofPennsylvania Journal of International Business Law explains the relationship of swaps to stocks and bonds. "In contrast to a stock or bond which represents financial claims with intrinsic value, a derivative instrument is a financial contract which derives its value from an underlying asset, reference rate, or index. The most common derivative instruments are options, forwards, futures, and swaps." Bruce S. Darringer, Swaps, Banks, Capital: An Analysis of Swap Risks a Critical Assessment ofthe Basle Accord's Treatment of Swaps, 16 U. Pa. J. Int'l Bus. L. 259, 261 (1995) (footnote omitted).
¶ 5 Generally, interest rate swap contracts are a legal agreement between two parties to exchange cash flows over an agreed period of time. Some derivatives are traded on the organized financial exchanges, such as the stock and commodities exchanges, but many, including interest rate swap agreements, are not.
 A "swap" is a contract between two parties ("counterparties") to exchange ("swap") cash flows at specified intervals, calculated by reference to an index. Parties can swap payments based on a number of indices including interest rates, currency rates and security or commodity prices.
Thrifty Oil Co. v. Bank of Am. Nat'l Trust Sav. Ass'n,322 F.3d 1039, 1042 (9th Cir. 2002).
¶ 6 An interest rate swap is fully described in Thrifty Oil Co.v. Bank of America National Trust and Savings Association,249 B.R. 537, 540 (S.D. Cal. 2000). The court stated:
 The "plain-vanilla" interest rate swap, the simplest and most common type of swap contract, obligates one counterparty to make payments equal to the interest which would accrue on an agreed hypothetical principal amount ("notional amount"), during a given period, at a specified fixed interest rate. The other counterparty must pay an amount equal to the interest which would accrue on the same notional amount, during the same period, but at a floating interest rate. If the fixed rate paid by the first counterparty exceeds the floating rate paid by the second counterparty, then the first counterparty must pay an amount equal to the difference between the two rates multiplied by the notional amount, for the specified interval. Conversely, if the floating rate paid by the second counterparty exceeds the fixed rate paid by the first counterparty, the fixed-rate payor receives payment. The agreed hypothetical or "notional" amount provides the basis for calculating payment obligations, but does not change hands.
Id.
¶ 7 One common strategy upon entering into such a contractual relationship is to attempt to "synthetically" convert interest exposure on fixed rate bonds to a variable rate. Id. The cash flows are derived by reference to some financial instrument or rate or rate index over a "notional" schedule of principal amounts. Id. The amount upon which the cash flows are based is called a "notional" amount because that amount does not physically change hands, nor does one party become indebted to the other "counterparty" to the agreement for that full amount.Id.
¶ 8 One of the more common variable rate indexes upon which to base an interest rate swap contract is a percentage of London Interbank Offered Rate ("LIBOR"). Thrifty Oil Co.,249 B.R. at 540 n. 2. The percentage of LIBOR used in the rate swap would be negotiated by the two counterparties to the agreement. Id.
There is considerable risk inherent in interest rate swap contracts due to factors such as the creditworthiness of the Issuer and the swap provider, as well as changes in financial position caused by increases or decreases in the LIBOR or other index upon which the contract is based. Id.
 Interest Rate Swaps In Oklahoma
¶ 9 The statutory powers and duties of a board of education make no specific reference to interest rate swaps. See 70 O.S.2001, § 5-105[70-5-105]; 70 O.S. Supp. 2005, § 5-117[70-5-117]. Only recently has the Legislature expressly authorized any governmental entities to enter into swap agreements. See, e.g., 2004 Okla. Sess. Laws ch. 5, § 48 (amending 60 O.S. 2001, § 176[60-176]); 2005 Okla. Sess. Laws ch. 2, § 6 (20) (codified at 70 O.S. Supp. 2005, §3980.6[70-3980.6](20)); 2005 Okla. Sess. Laws ch. 218, § 7(19) (codified as amended at 70 O.S. Supp. 2005, § 3980.6[70-3980.6](19)). In 2004, the Oklahoma Legislature amended Section 176 of Title 60 and allowed express trusts to enter into interest rate swaps, stating in pertinent part:
 A. Express trusts may be created to issue obligations, enter into financing arrangements including, but not limited to, lease-leaseback, sale-leaseback, interest rate swaps and other similar transactions and to provide funds for the furtherance and accomplishment of any authorized and proper public function or purpose of the state or of any county or municipality or any and all combinations thereof. . . .
2004 Okla. Sess. Laws ch. 5, § 48. Oklahoma school districts were not included in this amendment.
¶ 10 In 2005, the Oklahoma Legislature granted the power to engage in swap transactions such as interest rate swaps to the Oklahoma State Regents for Higher Education, the Board of Regents of the University of Oklahoma, the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, and the Oklahoma Capitol Improvement Authority ("OCIA"). The new language states:
 To exercise all other powers and functions necessary or appropriate to carry out the duties and purposes set forth in this act, including, but not limited to, the power to enter into transactions involving variable interest rates and interest rate swaps.
70 O.S. Supp. 2005, § 3980.6[70-3980.6](19) (emphasis added).
¶ 11 Again, Oklahoma school districts were not included within this amendment.
 Oklahoma School Districts
¶ 12 A common type of swap is one is which an Issuer (in your inquiry a school district) agrees to pay a variable rate to its swap provider (in your inquiry a financial institution) upon a notional amount equal to the principal amount of a series of the school district's fixed rate bonds in exchange for the swap provider paying the Issuer amounts equal to the fixed rates owed by the Issuer under such bonds. By the very nature of the transaction, a school district's ability to participate in an interest rate swap would depend upon its authority to incur variable rate debt, which will be considered later in this Opinion.
¶ 13 According to statute, Oklahoma school districts are to maintain and operate a complete public school system. 70 O.S.Supp. 2005, § 5-117[70-5-117](A)(3). While schools do have implied and incidental powers, those powers must relate to operating a public school system. As stated above other Oklahoma governmental entities, but not school districts, have received express powers from the Legislature to enter into interest rate swaps.
¶ 14 Section 5-115(G) of Title 70 states that the treasurer of every school district "shall invest the full amount of the investment account in. . . ." A list of nine categories of investments follows the mandatory language, and interest rate swaps are not included in the enumerated list. Id. § 5-115(G)(1)-(9). That same section requires the school district treasurer to "place primary emphasis on safety and liquidity in the investment of funds." Id. § 5-115(G). To the extent that interest rate swap agreements may be considered an investment, they are not authorized for Oklahoma school districts. Thus, the Legislature intended a conservative approach to investments by school board districts.
¶ 15 Additionally, to the extent that any debt creation would occur as a result of entering into an interest rate swap, a school district is limited by the authority it derives from Article X, Section 26(a) of the Oklahoma Constitution. "Except as herein otherwise provided, no . . . school district . . . shall be allowed to become indebted, in any manner, or for any purpose. . . ." See id. Interest rate swap agreements are not expressly mentioned as being allowed. See id. Further, the power of school districts to incur variable rate debt, essential to the fulfillment of an interest rate swap, is not authorized and is not contemplated by the language of the Oklahoma Constitution.See id.
¶ 16 As an example, under certain market conditions the Issuer (school district) could reduce its cash flow to meet its debt obligations and reduce its effective interest rate, possibly saving money (dependent upon other costs and fees in the swap agreement). Conversely, if the Index and variable rate changed and increased above the fixed rate, the Issuer would pay the financial institution under the swap agreement, thus incurring additional liability and worsening their cash flow situation.
¶ 17 There were no powers granted in express words for Oklahoma school districts to enter into interest rate swaps, but we must determine if that power could be fairly implied or is necessarily incidental to the powers expressly granted. Bd. of Educ. v.Cloudman, 92 P.2d 837, 841 (Okla. 1939).
¶ 18 Two Oklahoma cases are instructive in analyzing powers of school districts. In Cloudman, the Oklahoma Supreme Court clarified the powers of school boards. Factually, Cloudman
involved the potential liability of school board members for paying warrants, but the Oklahoma Supreme Court used that case to describe the source of power for school boards in stating:
 The school board has and can exercise those powers that are granted in express words; those fairly implied in or necessarily incidental to the powers expressly granted, and those essential to the declared objects and purposes of the corporation.
Id. at 841 (citation omitted).
¶ 19 A school district's power and authority was further clarified in 1991 by the Oklahoma Court of Civil Appeals when the court considered whether schools had the implied authority to establish a mandatory retirement age for teachers. Carlyle v.Indep. Sch. Dist. No. I-71, 811 P.2d 618, 619 (Okla.Ct.App. 1991). The school district has the express power to adopt appropriate personnel policies and sick leave guides, but the statutes made no specific mention of establishing retirement ages. Id. at 620. The court was unwilling to find an implied power to establish retirement ages for teachers in the absence of a specific reference in the statutes. Id. The court found that a mandatory retirement age was not "essential to the declared objects and purposes of the corporation." Id. (citation omitted).
¶ 20 Public trusts and the above listed state governmental entities had no express powers to engage in interest rate swaps until 2004 and 2005. Prior to 2004 and 2005, public trusts and the listed state governmental entities did have implied and incidental powers, but the Oklahoma Legislature decided to include express language to clarify that those entities could engage in interest rate swaps. The Oklahoma Legislature chose to narrowly construe the power to enter into interest rate swaps.
¶ 21 Accordingly, the Oklahoma Legislature's failure to provide express language for Oklahoma school districts to engage in interest rate swaps, coupled with the reasoning found in theCloudman and Carlyle cases and the inability of school districts to "invest" in interest rate swaps or incur variable rate debt, leads us to conclude that those powers should not be implied as essential to the declared objects and purposes of schools.
¶ 22 It is, therefore, the official Opinion of the AttorneyGeneral that:
 Oklahoma school districts lack the legal authority to enter into "swap" or "derivative financial product" agreements, as that power is beyond that necessary or implied to carry out the powers expressly granted to school districts. Okla. Const. art. X, § 26(a); 70 O.S. Supp. 2005, § 5-117(A).
 W.A. DREW EDMONDSON Attorney General of Oklahoma
 GLEN D. HAMMONDS Assistant Attorney General