[682 NYS2d 14]

Mount Lucas Associates, Inc., Respondent, v MG Refining and Marketing, Inc., Appellant and Third-Party Plaintiff-Appellant. Alan R. Kaufman et al., Third-Party Defendants-Respondents.

First Department, November 24, 1998

APPEARANCES OF COUNSEL

*David C. Singer* of counsel (*Bruce A. Schoenberg* and *Moon S. Kim* on the brief; *Dorsey & Whitney,* attorneys), for respondent and third-party defendants-respondents.

*Charles F. Kazlauskas* of counsel (*Gregory B. Classon,* attorney), for appellant and third-party plaintiff-appellant.

## OPINION OF THE COURT

ANDRIAS, J.

Plaintiff, Mount Lucas Associates, is an investment adviser registered under the Investment Advisers Act of 1940 (15 USC § 80b-1 *et seq.*) and a commodity trading adviser and commodity pool operator registered under the Commodity Exchange

Act (7 USC § 1 *et seq.*). Defendant and third-party plaintiff, MG Refining and Marketing, Inc., which is no longer in business, was, at the time in question, engaged in the business of investing, purchasing, selling, trading and participating in the oil futures and options market and in the purchase and resale of crude oil and refined petroleum products and it intended to enter into the business of providing price protection to users of crude oil and petroleum products. The third-party defendants, Messrs. Kaufman and Stratton, are the President and Vice-President of Mount Lucas.

On February 5, 1990, Mount Lucas and MG Refining entered into a services agreement in order to conduct the business of providing oil price risk management services to third parties whose business involved the actual use of crude oil and/or petroleum products. According to the agreement, MG Refining and Mount Lucas were to mutually agree upon oil price risk management services, oil price protection strategies and investment, purchase, sale, trading and participation in oil commodities by MG Refining, including the proceeds invested and derived therefrom, on a contract by contract basis, and were to confirm their respective agreement to each price protection contract in the confirmation form annexed as an exhibit to the agreement (the "Confirmed Oil Investments").

Mount Lucas agreed, *inter alia*, to use its expertise in the analysis of the oil futures and options markets to develop various hedging strategies to be used in oil price risk management; to review, on an ongoing basis, the effectiveness of such strategies; to transmit to the trading floor orders to implement such strategies relating to "Confirmed Oil Investments" in agreed-upon hedge accounts in the name of MG Refining; to provide daily written reports concerning the actual versus the planned positions of each "Confirmed Oil Investment" and the net profits and net losses to be derived therefrom; to provide daily advice to MG Refining, regarding payment relating to each investment; and, to advise and assist MG Refining in the marketing and promotion of price-protection programs to mutually selected customers for energy risk-management services.

The agreement also set forth MG Refining's obligations, including its responsibility, *inter alia*, to actively market, promote or sell the subject oil investments; to fund the initial margin and negative daily equity swings in such investments; to obtain all governmental approvals for the investment activities carried out pursuant to the agreement; to invoice all participating customers; and, to negotiate, execute and supervise implementation of the investments.

In return for its services, Mount Lucas was to be paid a $20,000 monthly fee plus a monthly profit participation in each "Confirmed Oil Investment" equal to 30% of the lesser of MG Refining's "Realized Net Profits" or "Total Net Profits". Mount Lucas was to share in any profits, but was not required to share in any of MG Refining's losses.

It is undisputed that MG Refining did not pay Mount Lucas any participation for September 1990 and that 4½ years later, in April 1995, Mount Lucas commenced this action, seeking $4,332,325 plus interest for such profit participation and another $3.02 million in damages for those transactions that were purportedly open and uncompleted as of September 30, 1991 or had expired between September 30, 1990 and September 30, 1991, the date designated by MG Refining as the effective date of termination of the services agreement. MG Refining answered with affirmative defenses and counterclaims and brought the third-party action, alleging breach of fiduciary duty and conflict of interest on the part of Mount Lucas's principals.

Defendant maintains that Mount Lucas was not satisfied merely with earning fees in excess of $1 million per month under the services agreement, but also committed MG Refining, on or about September 24, 1990, to a massive unauthorized trade with Bank Indosuez (the so-called Suez 7 transaction) notwithstanding that it was contractually prohibited from undertaking any transaction without defendant's prior consent. It further maintains that although such transaction caused MG Refining to lose more than $27 million, Mount Lucas is still insisting that it is entitled to receive over $2 million in profit participation from that deal alone.

In its affirmative defenses, MG Refining asserts that the complaint should be dismissed for failure to state a viable claim; that plaintiff's claims are barred by the doctrines of estoppel, laches and unclean hands; that Mount Lucas's causes of action are also precluded by the Statute of Limitations; that Mount Lucas has, by its conduct, waived any claims that it might have against defendant; that Mount Lucas has, at any rate, released the claims alleged in the complaint; that plaintiff's causes of action are barred due to its material breach of the services agreement; and, that its causes of action are further precluded by the Investment Advisers Act, the Commodity Exchange Act and the regulations promulgated thereunder, as well as by article 23-A of the New York General Business Law. In its counterclaims, defendant requests a dec-

laration that the services agreement is void and unenforceable or, alternatively, rescission of that agreement; damages in an amount in excess of $28 million; and, punitive damages of $10 million. Its third-party complaint also seeks $10 million in damages from Mount Lucas's principals.

The types of oil price-protection programs covered by the services agreement are a form of derivative instrument (a risk-shifting device whose value is "derived" from the performance of an underlying asset) known as commodity swaps, i.e., hedging contracts in which a bank, broker or other dealer acts as a middleman between oil producers and users. The parties to the transaction are referred to as the "dealer" and the "enduser" and collectively as the "counterparties". " 'Corporations are subject to volatile financial and commodities markets. Derivatives, by offering hedges against almost any kind of price risk, allow corporations to operate in a more ordered world' " (*Procter & Gamble Co. v Bankers Trust Co.*, 925 F Supp 1270, 1275, quoting Hu, *Hedging Expectations: "Derivative Reality" and the Law and Finance of the Corporate Objective*, 73 Tex L Rev 985, 994 [1995]). For example, in such a swap, an airline or a utility might agree to pay a refiner a fixed rate for fuel for a fixed number of years with the goal of protecting itself from future price increases, while the refiner is trying to guard against a downturn in oil prices.

Swaps are customized bilateral contracts, the value of which is tied to the price of some underlying asset, such as currency. The swap specifies the currencies to be exchanged, the rate of interest applicable, the payment timetable and other matters, in which two parties, or counterparties, agree to exchange a series of cash flows by making periodic payments to each other for a certain length of time. The amounts of these payments are determined by applying the relevant rate (that is, an interest or a foreign exchange rate or a commodity price) to some agreed-upon level of hypothetical principal, called a notional amount.[1]

A commodity swap involves a fixed-for-floating rate exchange, with the notional being some quantity of a commodity, in this case oil, and the floating price an average of the periodic observations of the spot price of the commodity. This enables an oil producer, through the commodity swap, to fix, for several years, the price that it will receive for that oil. Unlike stocks, bonds or commodities, swaps do not trade on an exchange.

---

1. In most swaps, with the exception of currency swaps, the notional amount does not change hands and is not at risk.

Whereas the Commodity Exchange Act expressly excludes privately negotiated forward contracts[2] from the jurisdiction of the Commodity Futures Trading Commission (CFTC), futures and options exchanges are scrutinized by the CFTC and the Securities and Exchange Commission (SEC), which have broad authority to monitor transactions, require registration and financial disclosures and, if necessary, to intervene in the marketplace to maintain fair and orderly trading.[3] Consequently, if a derivative is deemed to be a security, it is subject to regulation by the SEC, but, in the event that it is considered to be a commodity, it may be regulated by the CFTC. Where the derivative is neither a security nor a commodity, the instrument is not Federally regulated.

As a rule, options on commodity futures and futures contracts on government securities and stock indices come under the authority of the CFTC as commodity options, and this body has promulgated regulations that largely prohibit private commodity option transactions. In contrast, options on securities, including common stock, stock indices, government debt securities and options on foreign currency, fall under the auspices of the SEC, but options on swaps and interest rate protection agreements are generally not subject to either CFTC or SEC regulation. Of course, derivatives may also be amenable to Federal oversight through the regulation of institutions, such as banks, securities firms, investment banks and insurance companies, that act as dealers.

Notwithstanding that swaps bear some similarity to futures, the CFTC, in 1989, exempted from its regulatory jurisdiction swaps linked to the price of oil, gold and other commodities, asserting that swaps and hybrid financial products did not possess enough characteristics of futures or commodity options to be regulated under the Commodity Exchange Act. Therefore, a swap is not regulated by the CFTC as long as it is (1) individually tailored in its material terms; (2) terminable only with the

---

**2.** The primary statutory distinction between a future and a forward is the ability, in a future, to require physical delivery of the commodity.

**3.** The SEC also regulates the trading activities of "broker-dealers"; that is, those firms that buy and sell securities for themselves and as agents for their customers. However, since the SEC's jurisdiction relates only to securities, its authority does not necessarily encompass the entire organizational structure of a securities firm. The SEC, therefore, does not regulate affiliates of broker-dealers whose activities are limited to nonsecurities products, and this has resulted in the creation of holding companies and other affiliates of securities firms, not regulated by the SEC, that carry out their over-the-counter derivatives business free of SEC oversight.

consent of the counterparty without an exchange-style offset; (3) unsupported by a clearing organization or margin system; (4) undertaken in conjunction with each party's line of business; and, (5) not marketed to the general public. Swaps are, nevertheless, still subject to the operation of the antifraud and manipulation provisions of the Commodity Exchange Act.

In January 1997, prior to any depositions and after only limited discovery, Mount Lucas moved for partial summary judgment on its first cause of action, seeking $4,332,325 as its profit participation for September 1990, and to dismiss with prejudice MG Refining's amended counterclaims and the third-party action and to strike its eighth, ninth, tenth and eleventh affirmative defenses.

The IAS Court dismissed all of defendant's counterclaims, defenses and claims arising out of the Investment Advisers Act and the Commodity Exchange Act, as well as the regulations promulgated thereunder. The court further rejected MG Refining's attempt to void the services agreement because of plaintiff's unauthorized execution of the Suez 7 transaction; dismissed as time barred defendant's common-law claims against Messrs. Kaufman and Stratton regarding their breach of fiduciary duty at the inception of the services agreement; dismissed its third-party seventh cause of action for punitive damages against them; and granted summary judgment to plaintiff in the sum of $4,332,325, plus interest. Thus, what the court left standing is, for the most part, only MG Refining's counterclaims and claims relating to the Suez 7 deal.

■ We agree with the IAS Court that plaintiff's claims are not barred by the Investment Advisers Act or the Commodity Exchange Act inasmuch as the commodity options and swaps performed pursuant to the services agreement were not securities within the meaning of the three-pronged test established by the United States Supreme Court in *Securities & Exch. Commn. v Howey Co.* (328 US 293; *see also, Securities & Exch. Commn. v Life Partners*, 87 F3d 536; *Procter & Gamble Co. v Bankers Trust Co.*, 925 F Supp 1270, 1277, *supra*.)[4] *Howey* holds that an investment contract is a security, for purposes of

4. The court stated: "In the 1933 Securities Act, Congress defined the term 'security' as 'any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferrable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security,

the Securities Act, if investors (1) expect profits from (2) a common enterprise that (3) depends upon the efforts of others (328 US 293, 298-299, *supra; Securities & Exch. Commn. v Life Partners, supra*, at 542).

The first element, expectation of profits, is satisfied where the buyer is obviously not buying for consumption, but for the prospect of a return on his or her investment. The second element of this requirement—that there be a "common enterprise"—is ordinarily satisfied by a showing of so called "horizontal commonality", i.e., "the pooling of investment funds, shared profits, and shared losses" (*Securities & Exch. Commn. v Life Partners, supra*, at 543; *see also, Revak v SEC Realty Corp.,* 18 F3d 81, 87). While not all of the circuits perceive the term "common enterprise" in the same way (*see, e.g., Wals v Fox Hills Dev. Corp.*, 24 F3d 1016, 1018), the District Court for the Southern District of Ohio, Western Division, has found that the equity swaps therein did not satisfy the "common enterprise" mandate of *Securites & Exch. Commn. v Howey Co.* (*supra*), explaining that, while swaps "may meet certain elements of the *Howey* test whether an instrument is an investment contract, what is missing is the element of a 'common enterprise'" since there was no pooling of assets between the counterparties to the transaction (*Procter & Gamble Co. v Bankers Trust Co.*, 925 F Supp, *supra*, at 1278).

Thus, how the defendant there "hedged its swaps is not what is at issue—the issue is whether a number of investors joined together in a common venture. Certainly, any counterparties with whom [the defendant] contracted cannot be lumped together as a 'common enterprise.' Furthermore, [the defendant] was not managing [the plaintiff's] money; [the defendant] was a counterparty to the swaps, and the value of the swaps depended on market forces, not [the defendant's] entrepreneurial efforts. The swaps are not investment contracts" (*supra*, at 1278).

"While derivatives transactions in general are an important part of [the defendant's] business, and [the defendant]

---

certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or a certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.' 15 U.S.C. § 77b (1). The definition section of the 1934 Act, 15 U.S.C. § 78c (a) (10), is virtually identical and encompasses the same instruments as the 1933 Act. *Reves v. Ernst & Young*, 494 U.S. 56, 61 n.1 * * * (1989)".

advertises its expertise in putting together a variety of derivatives packages, the test is whether the [swaps] were widely distributed. These swaps are analogous to the notes that were held not to be securities on the basis that the plan of distribution was 'a limited solicitation to sophisticated financial or commercial institutions and not to the general public.' *Banco Español de Credito v. Security Pacific Nat'l Bank*, 763 F.Supp 36, 43 (S.D.N.Y. 1991), *aff'd* 973 F.2d 51 (2d Cir. 1992). The [swaps] were customized for [the plaintiff]; they could not be sold or traded to another counterparty without the agreement of [the defendant]. They were not part of any kind of general offering" and, therefore, did not comply with the second prong of the standard set forth in *Howey* (*supra*, at 1279).

Notwithstanding that the District Court stated that it was not determining that all leveraged derivatives transactions are not securities, or that all swaps are not securities and it was confining its ruling to the particular interest rate swaps involved therein (*supra*, at 1283), its reasoning is equally applicable in the present situation.

As for the third prong, MG Refining clearly did not expect to realize profits solely through the efforts of Mount Lucas since the parties' agreement certainly did not render defendant a passive investor. On the contrary, the agreement expressly listed numerous obligations that MG Refining was expected to perform as its part of the contract, and it is clear that defendant did not simply relinquish to plaintiff all control over its investment. Accordingly, despite defendant's insistence that plaintiff's advice concerned securities, the IAS Court was amply justified in determining that Mount Lucas supplied services concerning commodities and not securities. The Investment Advisers Act applies only to those individuals who offer investment advice in connection with securities, and defendant may not rely upon that statute as a means of avoiding the services agreement.

Finally, despite the fact that MG Refining, in its opposition to Mount Lucas's motion for partial summary judgment (which essentially consisted of an attorney's affidavit) failed to dispute the $4,332,325 amount sought in Mount Lucas's first cause of action, Mount Lucas failed to establish that such amount represented the profit participation to which it was entitled for the month of September 1990, i.e., 30% of the lesser of "Realized Net Profits" or "Total Net Profits", as computed pursuant to paragraph 4.2 of the February 5, 1990 services agreement. Accordingly, an assessment is necessary to compute the amount due.

We have considered defendant-appellant's other points and find them to be without merit.

■ With regard to MG Refining's motion (M-7244) to enlarge the record on appeal "to include certain materials obtained through on-going discovery since the perfection of the appeal", this motion is patently without merit. This is the second motion made by appellant to enlarge the record on appeal to include material not before the motion court. The first motion (M-6123) was denied on October 30, 1997. Despite that, MG Refining's "corrected brief" still contains references to and quotations from the documents unsuccessfully sought to be added to the record on appeal.

Moreover, its reply brief relies extensively upon the material presently sought to be added to the record on appeal, which consists of an excerpt from the deposition of third-party defendant Stratton taken October 30, 1997 and an affidavit of defendant-appellant's former employee dated October 24, 1997. Counsel ignores the basic precept that arguments in appellate briefs are to be based and appeals decided solely upon factual material before the court at nisi prius. In addition, pages 462 through 484 of the printed record on appeal contain a post-judgment motion for a stay of trial not properly part of the record on appeal.

Although we originally imposed counsel fees and sanctions against counsel for defendant-appellant, upon reconsideration, we vacate such monetary penalties. However, we take this occasion to call the Bar's attention to the provisions of CPLR 5526 and section 600.10 (b) of the Rules of this Court (22 NYCRR 600.10 [b]), which govern the contents of a record on appeal, and emphasize that, however well intentioned, inclusion of nonrecord material in a printed record on appeal or references to such material in briefs, on the possibility that a pending motion for enlargement of the record on appeal might be granted, is improper. The proper procedure, if a party wishes to enlarge the record on appeal, is to make a motion to that effect to this Court. In the event such motion is granted, then a supplemental record consisting of the additional material should be served and filed.

Accordingly, the judgment of the Supreme Court, New York County (Ira Gammerman, J.), entered July 24, 1997, which dismissed the first, second, third, fifth and seventh counterclaims and the eighth, ninth, tenth and eleventh affirmative defenses in the amended answer and counterclaims of defendant MG Refining and Marketing, Inc. and the first, second,

third and seventh causes of action in MG Refining's third-party complaint and granted plaintiff Mount Lucas Associates, Inc. partial summary judgment on its first cause of action in the amount of $4,332,325 plus interest from November 5, 1990, should be modified, on the law, only to the extent of vacating the award of $4,332,325 and remanding the matter for an assessment of the amount due to Mount Lucas under its first cause of action and otherwise affirmed, without costs.

Defendant-appellant's motion to enlarge the record on appeal is denied, with costs.

Plaintiff-respondent's cross motion to strike all references to matter dehors the record in defendant-appellant's "corrected brief" and reply brief and for costs and sanctions is granted to the extent of deeming all such references stricken, with costs.

Motion deemed one for reargument, which is granted, and, upon reargument, the prior unpublished decision and order of this Court entered on July 16, 1998 is recalled and vacated, and a new decision and order substituted therefor. (*See,* Appeal No. 62387 and M-7244/M-7373, decided herewith.)

WALLACH, J. P., RUBIN, WILLIAMS and TOM, JJ., concur.

Judgment, Supreme Court, New York County, entered July 24, 1997, modified, on the law, only to the extent of vacating the award and remanding the matter for an assessment of the amount due to Mount Lucas under its first cause of action, and otherwise affirmed, without costs. Defendant-appellant's motion to enlarge the record on appeal is denied, with costs. Plaintiff-respondent's cross motion to strike all references to matter dehors the record in defendant-appellant's "corrected brief" and reply brief and for costs and sanctions is granted to the extent of deeming all such references stricken, with costs. The unpublished decision and order of this Court entered herein on July 16, 1998 is hereby recalled and vacated (*see,* M-5515, decided herewith).