Dear Chairman Riebel,
¶ 0 We have received your letter requesting an official Attorney General Opinion in which you ask the following question:
 Does the Oklahoma Transportation Authority have the legal authority to enter into agreements for the use of derivative finance products, e.g., interest rate swap agreements, basis swaps, interest rate swap options, rate lock agreements, etc., in furtherance of its stewardship of the Oklahoma Turnpike Authority's revenue and debt management?
¶ 1 To answer your question, we must examine the nature of the Oklahoma Transportation Authority ("OTA"), the powers expressly granted to it by statute, and whether the power to enter into a "swap" contract may be fairly implied from such laws.
 Oklahoma Transportation Authority And Its Powers
¶ 2 The OTA is a body politic and corporate, and an instrumentality of the State. 69 O.S. Supp. 2005, § 1703[69-1703](A). The OTA has been held by the Oklahoma Supreme Court to be an agency of the State. Henry v. Okla. Tpk. Auth., 478 P.2d 898, 901-02
(Okla. 1970); In re Okla. Tpk. Auth., 386 P.2d 165, 168
(Okla. 1963). The OTA membership consists of the Governor and six members appointed by the Governor from designated districts around the State, subject to the consent of the State Senate. 69O.S. Supp. 2005, § 1703[69-1703](B). It is the legal successor to the Oklahoma Turnpike Authority, id. § 1703(F), and as of November 1, 2005 it is again known as the "Oklahoma Turnpike Authority." 2005 Okla. Sess. Laws ch. 68, § 1 (amending 69 O.S. 2001, §1701[69-1701]). The purpose of the OTA, as set forth in 69 O.S. Supp.2005, § 1701[69-1701], in pertinent part is:
 In order to facilitate vehicular traffic throughout the state and remove the present handicaps and hazards on the congested highways in the state, and to provide for the construction of modern express highways embodying reasonable safety devices . . . the Oklahoma Turnpike Authority, as created in Section 1703 of this title, is hereby authorized and empowered to construct, maintain, repair, and operate turnpike projects as defined in Section 1704 of this title, at such locations as shall be approved by the Transportation Commission, and to issue turnpike revenue bonds of the Authority payable solely from revenues to pay the cost of such projects.
Id.
¶ 3 The OTA finances, builds and operates turnpikes. Id. The express powers of the OTA are set out in 69 O.S. 2001 and Supp.2005, §§ 1705, 1709-1711 and 1719. The section authorizing issuance of the OTA bonds provides that such bonds may "[b]ear interest at a rate or rates that may vary as permitted pursuant to a par formula and for such period or periods of time, all as may be determined by the Authority." 69 O.S. 2001, §1709[69-1709](D)(4). Section 1719(a) likewise grants the OTA general authority to issue refunding obligations, and to determine the terms and conditions of such refunding bonds. In addition to the broad powers to construct and operate turnpikes, collect tolls thereon and to issue revenue bonds to finance such roads, the OTA is empowered "[t]o make and enter into all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers" (69 O.S. Supp. 2005, §1705[69-1705](k)), and further "[t]o do all things necessary or convenient to carry out the powers expressly granted in Sections 1701 through 1734 of this title." Id. § 1705(n). Finally, 69O.S. 2001, § 1901[69-1901] directs that provisions of the Transportation Code "be liberally construed to effect the purposes and objects hereof." Id.
¶ 4 In a prior Attorney General Opinion this office noted that in 1949 the Oklahoma Supreme Court held that State agencies have, in addition to the powers expressly granted to them by statute, implied powers as well. See A.G. Opin. 99-22, at 102 (citingOkla. Tax Comm'n v. Fortinberry Co., 207 P.2d 301, 304 (Okla. 1949). In addition to the powers expressly given by statute "an officer or [state] agency has, by implication . . . such powers as are necessary for the due and efficient exercise of the powers expressly granted, or such as may be fairly implied from the statute granting the express powers." Marley v. Cannon,618 P.2d 401, 405 (Okla. 1980). But such implied powers are not unlimited. "[A]n agency created by statute may exercise only those powers granted and may not expand those powers by its own authority." City of Hugo v. State ex rel. Pub. EmployeesRelations Bd., 886 P.2d 485, 492 (Okla. 1994) (footnote omitted). "In determining what [agency] authority may be implied from a statutory scheme, the statute as a whole [must be] considered and the legislative intent must be determined." Id.
Accordingly, we must consider what is involved in a "swap" agreement or other contract for derivative finance products.
 "SWAPS" And Other Derivative Finance Products
¶ 5 The concept of "interest swaps" or other kinds of "derivative" finance products is highly technical and of relatively recent origin.[1] In essence, such financial products have been developed in the last 20 years by investment bankers or other financial institutions and may be used for "altering the character of assets and liabilities, fine tuning risk exposure, lowering the cost of financing or speculating on interest rate fluctuations." Thrifty Oil Co. v. Bank of Am.Nat'l Trust Sav. Ass'n, 322 F.3d 1039, 1043 (9th Cir. 2002) [hereinafter Thrifty Oil 2].
¶ 6 Generally, a "derivative" "is a financial instrument that `derives' its value by reference to an index, the price of a commodity or security, an interest rate, an exchange rate, or another benchmark."[2] In a typical governmental agency swap transaction, a governmental entity and a counterparty (usually a bank or financial institution) agree to exchange or "swap" interest payments on certain specified ("notional") amounts for a fixed period of time.[3] When a swap is associated with outstanding debt, such as an agency's outstanding bonds, the issuer retains its legally binding obligation to bondholders for payment of both principal and interest, as if there were no swap contract in place.[4]
¶ 7 For instance, a bond issuer ("Agency") with bonds outstanding which are variable interest rate obligations might enter into a "swap" agreement with an investment bank ("Bank") whereby the Agency would pay periodic interest on a specific notional amount to the Bank at a fixed rate based on a specified index (such as the Bond Market Association, or "BMA" Index published in a daily public finance newspaper, The Bond Buyer, available at http://bondbuyer.com), and the Bank would make periodic payments to the Agency on the same notional amount at a variable rate based on the same, or a different index. The Agency uses proceeds of the Bank's payment to help pay principal and interest installments on its bonds as they become due. The net effect of the transaction would be that the Agency pays interest on obligations at a fixed rate rather than a variable rate, and uses the variable rate income from the Bank to pay the Agency's bond obligations, often realizing an economic advantage. The result is effectively a restructuring of previously incurred liabilities of the Agency. It is as if the Agency is making payments on fixed rate bonds although its variable rate bonds are still outstanding. Such a transaction is shown schematically at the end of this Opinion in "Exhibit A."
¶ 8 In another kind of "derivative" transaction an Agency might invest funds not immediately needed for governmental purposes in a financial instrument whereby the Bank, as provider, would make payments to the Agency (at either a fixed or variable rate) based on some mutually agreeable index.
¶ 9 In any derivative transaction, there are certain inherent risks. Such risks in a "swap" include:
 Counterparty Risk Involves the ability of each party to perform its obligations under the terms of the swap, taking into account its creditworthiness. For example, the Agency or the Bank might become unable to meet its payment obligations under the swap agreement. Even though each party has a high credit rating at the time the agreement is executed, subsequent events may cause a significant deterioration in creditworthiness of one party or the other.
 Basis Risk If the payments under the swap agreement and the interest rate on the bonds that are being "hedged" with the swap are not on the same index rate, a risk is incurred that the rate on the bonds and the rate on the swap may change materially over the life of the swap.
 Termination Payment "Derivative contracts are structured to require special payments if terminated earlier than their scheduled `maturity' to compensate the counterparty who has lost the benefit of its original deal and who cannot enter into [another] swap at the same or better terms on the date of termination."
 Collateral Deposit Often one party with a lower credit rating (i.e., an Agency) will be required to post substantial collateral to secure the risk taken by the counterparty of early termination, and the need for a termination payment. While this is not a "risk" per se, it does tie up money that otherwise might be devoted to other purposes.
 Tax Risk The risk that Congress could change the tax code, resulting in an increase in tax-exempt bond rates, thus skewing the relationship between taxable and tax-exempt indices, especially if the index chosen involves foreign currencies.
See NABL Fundamentals at 5, 6; Background Info. from Mr. Jim Joseph at 1, 2.
¶ 10 Why then, would an agency or bond issuer elect to enter into a derivative agreement?
 Timing A derivative transaction can often be completed in much less time than is required to document and close a bond issue, thus allowing an issuer to take advantage of changing market conditions.
 Better Rates Historically, longer maturities of fixed "swap" obligations are at lower interest rates than fixed rate tax-exempt bonds. Thus, issuers may realize cash flow savings on money to be used for bond payments.
See NABL Fundamentals at 6.
¶ 11 One court described "swap" or derivative financial products as bearing some similarity to futures trading. MountLucas Assoc., Inc. v. MG Ref. Mktg., Inc., 682 N.Y.S.2d 14, 19
(N.Y.App.Div. 1998). As an example of one of the risks involved, in Thrifty Oil 2, an oil company, as a counterparty in an interest rate swap agreement with a bank, was held liable for more than $5,428,000 in termination fees and attorneys' fees when it terminated swap agreements in a total notional amount of $45 million. Thrifty Oil 2, 322 F.3d at 1045-48, 1059-60. The experience of Orange County, California, where the county lost between one and two billion dollars through the unwise investment in derivative products has cast long shadows over the use of such products in public finance. See County of Orange v.Fuji Sec., Inc., 31 F. Supp.2d, 768, 785-86 (C.D. Cal. 1998);Wilson, 676 N.Y.S.2d at 536-38.
¶ 12 The point of the above discussion is that "swap" or "derivative financial product" agreements are not simple transactions and are fraught with financial risks. Common sense dictates that an agency that does not enter into such transactions on a regular basis must educate itself and understand the variables and risks involved before approving and signing a "swap" contract.[5] Further, before engaging in a "swap," counsel for the bond issuer must ensure the issuer has authority under state law to do so. See NABL Fundamentals at 1. In this regard, it is significant to note that several states whose statutes did not previously authorize "swaps" or derivative agreements (similar to the situation in Oklahoma) have enacted legislation allowing these transactions, subject to certain specified controls.[6] Finally, as discussed later in this Opinion, the Oklahoma Legislature has recently and specifically granted the power to do "swaps" to several kinds of governmental entities, but omitted the OTA and certain other State governmental agencies,[7] which gives rise to an indication of the Legislature's intent.
 Implied Powers
¶ 13 The threshold question on powers of executive branch agencies is not what they are prohibited from doing, but what they are allowed to do. See Tweedy v. Okla. Bar Ass'n,624 P.2d 1049, 1053-54 (Okla. 1981). "The role of the executive branch in expending state monies is limited primarily by the Legislature itself via the enactment of statutory law." A.G. Opin. 87-100, at 191. It is well settled that an officer or agency has by implication and in addition to the powers expressly given by statute, such powers as are necessary for the due and efficient exercise of the powers expressly granted, or such as may be fairly implied from the statute granting the express powers. Marley, 618 P.2d at 405 (citing Okla. Tax Comm'n v.Fortinberry Co., 207 P.2d 301, 304 (Okla. 1949)). "However, an agency [such as the OTA] created by statute may only exercise the powers granted by statute and cannot expand those powers by its own authority." Id. (citing Boydston v. State,277 P.2d 138, 142 (Okla. 1954)); see City of Hugo, 886 P.2d at 492.
¶ 14 It is urged by proponents of swap transactions that, because the OTA's enabling legislation authorizes the Authority to "make and enter into all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers" (69 O.S. Supp. 2005, § 1705[69-1705](k)), and "[t]o do all things necessary or convenient to carry out the powers expressly granted in Sections 1701 through 1734 of [Title 69]" (id. § 1705(n)), and further, because the Act is to be "liberally construed" (69 O.S. 2001, § 1901[69-1901]), it must follow that entering into a swap agreement is necessary or convenient (or incidental) to carry out the powers expressly granted to the Authority, and therefore allowed by the OTA enabling legislation. 69 O.S. Supp.2005, § 1705[69-1705](n). We do not agree.
¶ 15 Construction of turnpikes in Oklahoma and the creation of the OTA's predecessor agency was first authorized by the Legislature in 1947. See 1947 Okla. Sess. Laws ch. 6, §§ 1-22. While the 1947 legislation included broad language empowering the agency to enter into contracts and to do all things necessary or incidental to accomplishing its purposes, this was long before the concept of "swaps" or "derivative financial agreements" came into being. See id. § 5.
¶ 16 As previously discussed, entering into a "swap" agreement creates obligations on the OTA and exposes the OTA to risks not associated with a typical bond transaction. A "swap" is a financial product in and of itself and may be entered into independently of a bond transaction. We cannot impute to the Legislature a willingness for the OTA to expose itself to financial liability over and above that encountered in the normal bond issuance process.
¶ 17 While courts have been fairly cooperative in allowing agencies to do things not expressly authorized in their enabling statutes, we do not believe such a case is presented here. See,e.g., Schrom v. Okla. Indus. Dev. Parks Dep't, 536 P.2d 904,906 (Okla. 1975) (holding that an agency's purchase of liability insurance was consistent with its authorization to hold property or enter into lease-rental contracts).
¶ 18 Most recently, in Oklahoma Public Employees Associationv. Oklahoma Department of Central Services, 55 P.3d 1072, 1076
(Okla. 2002) [hereinafter OPEA], the issue was whether the Department of Human Services (DHS), acting through the Department of Central Services (DCS), had implied authority to enter into a contract that outsourced the management of a DHS facility for care of mentally retarded persons to a private company, despite the lack of specific statutory authority for such outsourcing.Id. In remanding the case to District Court for further proceedings, OPEA directed the trial court to determine whether such outsourcing was "necessary" for DHS to perform its statutory duty to operate the institution. Id. at 1088.
¶ 19 In remanding the case, the court in OPEA suggested a test for determining what is "necessary" for an agency to perform its statutory duties. The court said:
 In determining what is "necessary" for DHS to perform its duties the trial court might consider (1) whether the Legislature provided a mechanism for DHS to follow, (2) whether the statutes and their history relating to DHS and Greer Center suggest that an implied power is part of a statutory scheme, (3) whether withholding outsourcing power from DHS would be inconsistent with the purpose of some constitutional or statutory provision, or (4) whether the Legislature appropriated funds for the expenditure of outsourcing at Greer Center.
Id. at 1088 n. 21 (citations omitted). The court further noted that the Legislature may "expressly grant an implied power" to an agency in its enabling statutes. Id. at 1084 n. 12. Such observation is relevant in the present instance, where the Legislature has specifically included in the OTA statutes the power for the OTA to "do all things necessary or convenient to carry out the powers expressly granted" in the legislation, and has decreed that the OTA statutes are to be liberally construed.69 O.S. Supp. 2005, § 1705[69-1705](n); 69 O.S. 2001, § 1901[69-1901].
¶ 20 The words of a statute must be given their ordinary meaning, unless a contrary meaning plainly appears. 25 O.S.2001, § 1[25-1]. "Liberal" means "free from restraint or check," or not restricted to the literal meaning of a writing. Webster's Third New International Dictionary 1303 (3d ed. 1993); seeErickson v. City of Tahlequah, 82 P.3d 114, 115 (Okla.Ct.App. 2003).
¶ 21 While not all the elements of the OPEA test are present in the OTA situation, in comparing the Legislature's grant of very broad powers for the OTA to construct and finance toll roads and to manage the finances of such system, coupled with the mandate that the OTA statutes be "liberally construed," with its actions in recent sessions, granting the power to engage in swap transactions to other state entities while leaving out the OTA, we have serious doubts as to whether the OTA has implied power to do swaps. In case of doubt as to the existence of an implied power, such power is construed against the agency. See Ex parteHiggs, 263 P.2d 752, 755 (Okla. 1953).
¶ 22 The Legislature recently authorized specific governmental entities, not including the OTA, to enter into "swaps" or derivative transactions. See 2004 Okla. Sess. Laws ch. 5, § 48; 2005 Okla. Sess Laws ch. 2, § 6(20); 2005 Okla. Sess Laws ch. 218, § 7(19). In 2004, the Second Session of the 49th Oklahoma Legislature passed H.B. 2575 and granted the power to engage in interest rate swaps to public trusts, when it amended 60 O.S.2001, § 176[60-176], providing in pertinent part:
 A. Express trusts may be created to issue obligations, enter into financing arrangements including, but not limited to, lease-leaseback, sale-leaseback, interest rate swaps and other similar transactions and to provide funds for the furtherance and accomplishment of any authorized and proper public function or purpose of the state or of any county or municipality or any and all combinations thereof. . . .
2004 Okla. Sess. Laws ch. 5, § 48 (amending 60 O.S. 2001, §176[60-176]) (emphasis added). The OTA is not a public trust, thus it is not included in this authorization to do swaps.
¶ 23 In 2005, the First Regular Session of the 50th Legislature passed H.B. 1191 and S.B. 745, which among other things, expanded the powers of certain entities and granted to the Oklahoma State Regents for Higher Education, the Board of Regents of the University of Oklahoma, the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges and the Oklahoma Capitol Improvement Authority ("OCIA") (see 70 O.S. Supp. 2005, §3980.3[70-3980.3](1)) the power to engage in swap transactions, providing:
 To exercise all other powers and functions necessary or appropriate to carry out the duties and purposes set forth in this act, including, but not limited to, the power to enter into transactions involving variable interest rates and interest rate swaps.
2005 Okla. Sess Laws ch. 2, § 6(20); 2005 Okla. Sess Laws ch. 218, § 7(19) (codified at 70 O.S. Supp. 2005, § 3980.6[70-3980.6](19)) (emphasis added). Again, the OTA is not included in this list. We note that each of the entities listed in the above legislation already had "necessary or convenient" language (which was left unchanged) in their respective statutory powers prior to enactment of the amendments, similar to the language in the statutes setting out the OTA's powers.[8]
¶ 24 In the 58 years since the creation of the OTA, the Legislature has enacted numerous changes to the OTA's statutes, and if it had wanted to expand the OTA's implied powers to allow swap transactions it could have amplified the terms "necessary," "incidental" or "convenient," or expressly granted swap power, but it did not. The 2005 Legislature passed H.B. 1969 dealing with various aspects of the OTA operation, including amendments to one of the OTA's "powers" statutes, 69 O.S. 2001, § 1705[69-1705],
but remained silent on the swap issue. See 2005 Okla. Sess. Laws ch. 68, §§ 1-7. The Legislature's silence, when it has authority to speak, may be considered as giving rise to an implication of legislative intent. City of Duncan v. Bingham,394 P.2d 456, 460 (Okla. 1964). It is presumed that the Legislature does not intend to make any change in existing law, except as it expressly declares such change. State ex rel.Caldwell v. Oldfield, 98 P. 925, 926 (Okla. 1908). Thus, it must be concluded that the Legislature did not intend to extend the powers to engage in swap transactions to the OTA.
¶ 25 In so concluding the OTA has not been granted swap powers by the Legislature, we have used the principle of statutory construction called "expressio unius est exclusio alterius,"
that the mention of one thing in a statute impliedly excludes another thing. We are mindful that such a maxim of statutory construction is not of universal application, and should only be applied as an aid in arriving at intention, and should never be followed to the extent of overriding a different legislative intent. Pub. Serv. Co. v. State ex rel. Corp. Comm'n,842 P.2d 750, 753 (Okla. 1992). But in the present instance, where the Legislature plainly had the opportunity to give the power to engage in swaps to a wide variety of governmental entities, but it only granted the power to public trusts and the entities enumerated in the 2005 legislation, we believe the conclusion is warranted that the Legislature intended to grant the power to only those entities named.
¶ 26 We conclude that to allow the OTA to enter into contracts exposing the agency to financial losses or risks not associated with its expressly authorized, ordinary activities related to the building, financing and operation of state toll roads was not intended by the Legislature, and is going far past the standard of "necessary or convenient to carry out the powers expressly granted." 69 O.S. Supp. 2005, § 1705[69-1705](n). Further, the Legislature's failure to grant swap powers to the OTA when granting such powers to other agencies indicates the Legislature did not intend for the OTA to have such power.
 ¶ 27 It is, therefore, the official Opinion of the Attorney General that: The Oklahoma Turnpike Authority lacks the legal authority to enter into "swap" or "derivative financial product" agreements, as such is beyond that "necessary or convenient to carry out the powers expressly granted" to the Oklahoma Turnpike Authority. 69 O.S. Supp. 2005, § 1705(k), (n); City of Hugo v. State ex rel. Pub. Employees Relations Bd., 886 P.2d 485, 492 (Okla. 1994); Boydston v. State, 277 P.2d 138, 142 (Okla. 1954); Okla. Pub. Employees Ass'n v. Okla. Dep't of Cent. Serv., 55 P.3d 1072, 1081-87 (Okla. 2002); Ex parte Higgs, 263 P.2d 752, 755 (Okla. 1953).
 W.A. DREW EDMONDSON Attorney General of Oklahoma
 LYNN C. ROGERS Assistant Attorney General
 Exhibit A
An "index based" swap from the Bond Attorney's Workshop Sept. 14-16, 2005; Reproduced with the permission of the National Association of Bond Lawyers, copyright 2005.
[1] A sense of how complex these transactions are can be gained from a review of Bank One Corporation v. Commissioner ofInternal Revenue, 120 T.C. 174 (2003) [hereinafter Bank One], in which the tax court extensively discusses the history and nature of "swaps" and other derivative financial products. Seeid. at 185-94. The trial in this case, to resolve a dispute between the Internal Revenue Services and a swap dealer bank, took more than a year and resulted in a trial transcript of over 3,500 pages. According to Bank One the first interest rate swap was consummated in 1981, and the "swap" industry has steadily evolved and become more complex in the ensuing years. Id. at 186-87; see Thrifty Oil Co. v. Bank of Am. Nat'l Trust Sav.Ass'n, 322 F.3d 1039, 1042 (9th Cir. 2002); Thrifty Oil Co. v.Bank of Am. Nat'l Trust Sav. Ass'n, 249 B.R. 537, 540-41 (S.D. Cal. 2000).
[2] Antonio D. Martini, Nat'l Ass'n of Bond Lawyers, Fundamentals of Mun. Bond Law Seminar 1 (2004) [hereinafter NABL Fundamentals]. (A copy is on file with the Oklahoma Attorney General's office or the National Association of Bond Lawyers in Chicago, Ill.) See also Wilson v. Tully, 676 N.Y.S.2d 531,536-38 (N.Y.App.Div. 1998); Bank One, 120 T.C. at 186;Thrifty Oil 2, 322 F.3d at 1042-44; In re Thrifty Oil Co.,249 B.R. at 540-41.
[3] See n. 2 above; see also Background Info. from Mr. Jim Joseph, State Bond Advisor, to the Council of Bond Oversight Meeting 1 (Aug. 25, 2005) (on file with the Okla. Attorney General's office).
[4] See n. 3.
[5] See Joe Mysak, Public Officials Aren't Compensated forSwap Risks, News Commentary, Bloomberg Columnists (Nov. 18, 2005), http://www.bloomberg.com/apps/news?pid=10000039sid=aZF2acgZYs.8refer=columnist_mysak; Joe Mysak, Pennsylvania County Seeks toStop Bleeding on Swaps, News, Bloomberg Columnists (Nov. 16, 2005), http://www.bloomberg.com/apps/ news?pid=10000039=a0Nj5Yy9UsCE=columnist_mysak; Joe Mysak, Alabama County Paid Too Much for Swaps. Did You?,
News Commentary, Bloomberg Columnists (Aug. 5, 2005), http://www.bloomberg.com/apps/news?pid=10000039=apQ55BOymKWU_my#; Joe Mysak, Yield Burning on Muni Swaps is a Matter of Markups,
News Commentary, Bloomberg Columnists (Aug. 24, 2005), http://www.bloomberg.com/apps/news?pid= 10000039sid=aHs2S6b0Qgk0=columnist_mysak. At a speech before the National Association of Bond Lawyers in Chicago on September 15, 2005 attended by the author, Commissioner Roel C. Campos of the Securities and Exchange Commission suggested governmental agencies participating in swap transactions should consider bidding the fees on such swaps to avoid the possibility of overcharging byswap providers.
[6] See, e.g., the following statutes broadly empowering a state to enter into swap agreements:
Alabama Ala. Code § 41-4-42 (1975)
Arizona Ariz. Rev. Stat. Ann § 35-1002 (West 1994)
Arkansas Ark. Code Ann. § 19-9-707(4) (Michie 1989)
California Cal. Gov't Code § 5922(a), (b) (West 1987)
Dist. of Columbia D.C. Code Ann. § 1-204.90(a)(1) (2000)
Illinois 30 Ill. Comp. Stat. Ann. § 425/6 (West 2004)
Massachusetts Mass. Gen. Laws Ann. ch. 29 § 38C (West 1989)
These statutes empower specific state agencies to enter into swap or derivative agreements:
Arkansas Ark. Code Ann. § 27-90-206(f) (Michie 2003) (turnpikes)
California Cal. Gov't Code § 16913(a) (West 2003) (pension fund)
Connecticut Conn. Gen. Stat. Ann. § 8-250(39) (West 2004) (housing finance)
Florida Fla. Stat. Ann. § 191.012(3) (West 1997) (fire districts)
Idaho Idaho Code § 67-8721 (Michie 2001) (state bond bank)
Louisiana La. Rev. Stat. Ann. § 39:99.16(B) (West 2001) (tobacco fund)
Maine Me. Rev. Stat. Ann. tit. 30-A § 6043(10) (West 2005) (bond bank)
Massachusetts Mass. Gen. Laws Ann. ch. 81A § 5 (West 1997) (turnpikes)
New Hampshire N.H. Rev. Stat. Ann. § 6:8-c (1993) (treasurer)
New Jersey N.J. Stat. Ann. § 52:18B-7(g), (h) (West 2002) (tobacco fund)
New York N.Y. Unconsol. law § 6262 (McKinney 1985) (urban development)
North Carolina N.C. Gen. Stat. Ann. § 116D-13 (2000) (University)
N.C. Gen. Stat. Ann. § 142-91(2003) (state facilities)
South Carolina S.C. Code Ann. § 38-14-60(B), (B)(19) (Law. Co-op. 2002) (insurance)
Virginia VA. Code Ann. § 36-55.44:1 (Michie 1994) (housing)
Note: The above laws are illustrative and not comprehensive as to all such statutes.
[7] See 60 O.S. Supp. 2005, § 176[60-176](A); 70 O.S. Supp. 2005, § 3980.6[70-3980.6](19); see also discussion below in the last five paragraphs of the "Implied Powers" section of this Opinion.
[8] See 70 O.S. Supp. 2005, § 3206[70-3206](o) (State Regents for Higher Education); 70 O.S. Supp. 2005, § 3305[70-3305](o) (University of Oklahoma Regents); 70 O.S. Supp. 2005, § 3412[70-3412](15) (Oklahoma State University Regents); 73 O.S. 2001, § 161[73-161](10) (Oklahoma Capitol Improvement Authority).